**PENNSYLVANIA AGRICULTURAL COOPERATIVE MARKETING ASSOCIATION, Plaintiff,**

v.

**EZRA MARTIN COMPANY et al., Defendants.**

Civ. A. No. 79–1213.

United States District Court, M. D. Pennsylvania.

July 16, 1980.

Christian High, J. Leslie Landis, Leroy B. Martin, Franklin N. Hoover, James Kettering, William M. Sloyer, Glenn B. Godkley and Samuel S. Wenger, pro se.

Jesse C. Robinson, Christopher W. Mattson, Barley, Snyder, Cooper & Barber, Lancaster, Pa., for Harleysville Mut. Ins.

**566**

Emmett Lehman, James N. Clymer, Lancaster, Pa., for Ezra Martin Co.

David C. Jones, Asst. U. S. Atty., Harrisburg, Pa., Joanne I. Schwartz, James A. Brennan, U. S. Dept. of Agricultural, Packers & Stockyards Div., Washington, D. C., for United States Dept. of Agriculture.

E. Raymond Lynch, Lionville, Pa., for Vintage Sales Stables.

David C. Eaton, Nauman, Smith, Shiller & Hall, Robert C. Spitzer, Harrisburg, Pa., for Commonwealth Nat. Bank.

Melvin H. Hess, John R. Kennel, II, Lancaster, Pa., for Dennis Forry.

Pamela R. Weiss, Weiss, Weiss & Weiss, Lebanon, Pa., for Leroy Martin and James Kettering.

D. M. Barron, Randol Zimmerman, Barron & Zimmerman, Lewistown, Pa., for Samuel S. Wenger.

Edmund G. Myers, Myers, Myers, Flowers & Johnson, Leymone, Pa., for plaintiff.

James H. Hess (not an attorney), Lancaster, Pa., for Tri-Springs Farm.

## MEMORANDUM

HERMAN, District Judge.

In late August and early September, 1979, Ezra Martin Company (hereafter referred to as "Martin") defaulted on its payments to a number of persons who had supplied it with livestock. This litigation arose from that default and is related to Civil Action No. 79–1183, in which Commonwealth National Bank (hereafter referred to as "the Bank") sought to enjoin Martin from providing certain information to representatives of the United States Department of Agriculture (hereafter referred to as "the Department"). The Department needed the information to fulfill its obligations under the Packers and Stockyards Act (hereafter referred to as "the Act"), 7 U.S.C. §§ 181–229. In particular, section 206 of the Act imposes a statutory trust on meat packers, such as Martin who have defaulted on payments to suppliers. 7 U.S.C. § 196.[1]

On September 21, 1979 we denied the Bank's motion for a preliminary injunction in No. 79–1183 to block the Department's proceeding and on September 24, 1979 we ordered Martin to obey the subpoena duces tecum served on it by representatives of the Department. Because we believed that action was effectively terminated, we asked counsel for the Bank if it would withdraw its request for a permanent injunction preventing the dissemination of information by Martin. By letter filed December 27, 1979 counsel for the Bank informed us that he felt it would be inappropriate to terminate the action at that time. Counsel later raised the vague possibility of advancing some claim for damages against the Department.

On February 15, 1980 we referred the matter to United States Magistrate Havas who promptly ordered the parties to file briefs concerning the potential dismissal of 79–1183 as moot. On February 28, 1980, before the deadline for the briefs expired, the Bank agreed to discontinue the case.

The matter with which we are immediately concerned arises from the same factual background as Civil No. 79–1183. On September 2, 1980, the Pennsylvania Agricultural Cooperative Marketing Association (hereafter referred to as "PACMA") filed a complaint against Martin seeking recovery for the failure of Martin to pay it for livestock delivered within the terms of the Act. We issued a temporary restraining order on that date restraining Martin from dissipating or disposing of funds it had deposited in account number 808–972–8, American Bank, Greenfield Office, Lancaster, Pennsylvania (hereafter referred to as "the Fund"). Our order required only that Martin retain at least $30,000 in the Fund until payments were made in accordance with the Act.

---

1. The Bank's interest in this matter is that of a secured creditor of Martin. The Bank holds a mortgage of Martin and various other security agreements. The Bank has claimed that it has a priority over all claims against Martin other than those entitled to the priority created by the statutory trust provision of the Act.

On October 2, 1979 we issued a preliminary injunction to the same effect as our previous restraining order. We directed that the matter proceed as an interpleader action and added additional parties by our order of October 11, 1979. We were also informed that the amount of the Fund was well over $100,000 and that the total amount of all claims was approximately $90,000. On October 19, 1979 counsel for the Bank and Martin telephoned our office with a request that we permit Martin to make certain payments out of the Fund.[2] We told Martin that it could make some payments out of the Fund in its discretion. Our exact reply was:

> As trustee of the fund, Ezra Martin has the power and authority to make payments from the Fund so long as it contains at least enough money to pay the colorable claims of all unpaid cash suppliers.

The interpleading parties presented their claims and petitions through November and December of 1979. Harleysville Mutual Insurance Company (hereafter referred to as "Harleysville") moved to intervene in the action on January 10, 1980 and Magistrate Havas granted the motion on February 27, 1980.[3]

Magistrate Havas conducted a pre–trial conference and issued discovery and briefing schedules on February 15, 1980. On March 3, 1980 many of the parties represented by counsel supplied us with memoranda explaining the legal issues before us. The Department filed its memorandum, subsequent to receiving an extension of time, on March 7, 1980. PACMA filed a motion for summary judgment with a supporting brief on March 24, 1980.[4] Counsel for the Bank received from Magistrate Havas a number of oral and written extensions

of time in which to oppose PACMA's motion. The Bank opposed PACMA's motion in its brief filed on June 16, 1980. Our proposed order on June 2, 1980, however, indicated that all claims other than those with which it dealt would be dismissed. PACMA did not object to this and we will therefore deny its motion for summary judgment.

On April 14, 1980 counsel for the Bank and Martin stipulated to the payment of the principal claims of most of the suppliers. We accepted the stipulation and ordered Martin to make the payments from the Fund on April 18, 1980. On April 28, 1980 counsel for the Bank and Martin stipulated to the payment of the principal claims of two other suppliers. We ordered payment according to the stipulation on April 30, 1980. The only claim of a supplier not agreed to by the Bank and Martin was from Tri–Springs Farm for $1,090.49. Harleysville, as surety on the bond of Martin, has paid that claim.

As of May 30, 1980 we became aware that the principal amounts of the claims of all interpleaded parties had been paid, either from the Fund or by Harleysvile. The only matters remaining for our consideration were the payment of interest to the claimants from the time Martin's obligation arose to the time of payment and the disposition of the Fund after all payments had been made from it. In the end of May 1980 a proposed order was circulated among the parties but was never officially presented to the court for filing. We reviewed a copy of the proposed order and filed our own proposed order on June 2, 1980. The effect of our proposed order would be to enter judgment for the interpleading claimants for the principal amounts already paid and for interest at a rate of 6% per annum. Said

---

2. Counsel for the Bank informed the court that we had an "obligation" to act speedily because we became the trustee of the fund when we accepted jurisdiction over the claims. We rejected such a contention as totally unfounded and without authority. We replied: "The court does not regard itself as trustee of the fund in any way whatsoever. Ezra Martin is the trustee."

3. Harleysville is the surety on a bond by Martin, required by the Act, to secure payment from the packer to the sellers of the livestock.

4. On May 2, 1980, motions for summary judgment filed by claimants Forry, L. Martin, and Kettering were deemed withdrawn for their failure to file supporting briefs pursuant to our Local Rule 301.01(d).

interest would run from the date following the claimant's sale of livestock to Martin to the date of payment of the principal amount. Our proposed order also provided that the interest judgment should be satisfied out of whatever amount of money remained in the Fund.[5]

Our order filed on June 2, 1980 gave all parties until June 16, 1980 to file any objections to our proposed order. By letter dated June 4, 1980, the Bank provided us with an "informal" suggestion that we revise the order. This letter questioned the substance of our proposed order. On June 16, 1980, the Bank filed a formal brief objecting to both the substance and the legal basis of our proposal. No other party has objected to our proposed order.

The Bank does not object to the part of the order entering judgment in favor of the claimants and against Martin for 6% interest. It only objects to satisfaction of the interest judgments from the remaining principal and accrued interest in the Fund.[6] The Bank claims its priority over the assets of Martin extends to the money remaining in the Fund. That is the sole issue remaining for our determination in this litigation.

Before we discuss the merits of the legal issue presented by the Bank, we feel compelled to examine a statement the Bank made in the closing paragraph of its brief: "The proposed order has the effect of punishing Commonwealth National Bank, severely under the circumstances, for failure of Ezra Martin Company to make prompt payment to sellers of livestock." Brief of the Bank, p. 7 (filed June 16, 1980). Such a statement stretches the credulity of this court beyond its bounds.

It appears beyond question to us that the primary force behind any delays in payments was that of the Bank. In Civil No. 79–1183 the Bank was unquestionably the party trying to delay or deter the Department in its efforts to enforce the clear congressional mandate of the Act. Throughout the action now at hand, it has only been the Bank that has opposed or objected to any course of proceeding.[7] We can understand the bank's interest in protecting its security interest in the property of Martin, but the Bank cannot claim that its attempt to extract as much as it can from the carcass of Martin is translatable into delays by Martin. From the beginning of these proceedings, Martin has taken a most passive position. The Bank obviously threatened Martin with legal action had the latter fulfilled its duties as statutory trustee and determined on its own to whom payments should have been made. See Transcript p. 178 (Civ.No.79–1183, Sept. 20, 1979) (statement of Emmett R. Lehman, counsel for Martin).

We also believe that the Bank was responsible, before instituting the legal action in Civ.No.79–1183, for Martin's refusal to provide the Department with information. This belief grows from our perception of the entire record and the conduct of the parties in both that action and the present

---

5. Subsequent to our statement to Martin that it was trustee of the Fund and should dispose of the corpus as it believed appropriate, the total amount of principal in the Fund was $95,-981.94. The total claims properly paid from the Fund amounted to $91,120.07. The amount of the principal remaining in the Fund is $4,861.87. For some reason, Martin neglected to place the Fund in an interest–bearing account until January 1980. The amount of interest in the Fund as of May 5, 1980, therefore, was only $1,344.39. The total amount of the Fund, as of May 5, 1980, was $6,206.26.

  The Bank has interpreted our proposed order as requiring a distribution of the entire Fund to the claimants on a pro rata basis. We did not intend that result. Our final order will require only that the interest judgment be satisfied from the Fund and that any further amount in the Fund then be distributed among Martin's creditors according to their respective priorities.

6. Originally, the Bank did not object to satisfaction of the interest judgments out of the accrued interest of the Fund. Now the Bank is contesting all further payments out of the Fund.

7. We do acknowledge, however, that it appears to have been the Bank who finally initiated the stipulations permitting payments of the principal to the claimants. Too little; too late.

one.[8] We will not further belabor the point, but we are convinced that it has been the Bank, and not Martin, who has prevented prompt payment to the legitimate claimants of the statutory trust. The Bank will not, therefore, be punished for any faults of Martin.

Returning to the legal issue before us, we find that the Bank's position is without merit. The Bank argues that, upon Martin's payment of the principal amount of the claim, the trust expires and the claimants lose any priority for consequential damages or interest. Despite the Bank's bold assertion that "there is no reasonable way to interpret the statutory trust provisions other than as imposing the trust only for the payment of the purchase price of livestock", Brief of the Bank, p. 5 (June 16, 1980), we believe that there is.

The Bankruptcy Court for the Southern District of Florida issued an order in 1979 that granted priority to "the rights and claims" of livestock suppliers situated similarly to the claimants presently before us. *First State Bank of Miami v. Gotham Provision Company, Inc.*, 1 B.R. 255, 261 (Bkrtcy.S.D.Fla.1979). The court in *Gotham* awarded the suppliers eight percent interest plus costs as well as their principal claims. The priority decision extended to each element of the award. The court in *Gotham*, however, did not address the issue now raised by the Bank and we will review the law applicable to the priority of the interest judgment against Martin.

In 1976 Congress amended the Packers and Stockyards Act partially as a reaction to and in recognition of the uniquely perilous position held by livestock producers and suppliers in the nation's agricultural economy. *See* S.Rep.No.94–932, 94th Cong., 2d Sess., at pp. 4–6, *reprinted in* [1976] U.S. Code Cong. & Admin.News pp. 2267, 2271– 72 (hereafter referred to as "S.Rep.No.94–

932"). To provide the necessary financial protection for suppliers of livestock, Congress established the statutory trust provisions of the Act for the benefit of unpaid cash suppliers. 7 U.S.C. § 196. The trust provision is one of the three important safeguards in the Act. The other two are packer bonding, 7 U.S.C. § 204, and prompt payment requirements, 7 U.S.C. § 228b.

Through the 1976 amendments, Congress specifically intended to prevent recurrences of the catastrophic losses suffered by livestock suppliers in the 1976 bankruptcy of American Beef Packers. *See* S.Rep.No.94– 932, *supra*, [1976] U.S.Code Cong. & Admin. News at 2271. The problem in the collapse of American Beef Packers arose from the priority of a financing institution's duly perfected security interest in the inventory, receivables, and proceeds of the packer. Congress believed that the trust provision of the Act offered suppliers "the best protection against packer bankruptcies." S.Rep.No.94–932, *supra*, [1976] U.S.Code Cong. & Admin.News at p. 2279.

Both proponents and opponents declared that the Act gave the livestock suppliers the most protection of any law aiding sellers. *See* Brief of Department, pp. 4–5 (filed March 7, 1980) and authority cited therein. Any interpretation that limits the protection of the Act would be contrary to the clear intent of Congress. As the Bankruptcy Court of our own District has recently ruled:

> There is no question that the legislation in question [the Act] is remedial in nature and intended to be construed liberally with its purpose to prevent economic harm to producers and consumers.

*In re R & D Investments, Inc.*, BK 77–1225 & BK 77–1281, slip op. at pp. 5 & 6 (Bankr. Ct.M.D.Pa., Nov. 21, 1979).

The statutory trust is essential for the full protection of the unpaid suppliers of

---

8. We are fully aware that Paul L. Hess, chief executive officer of Martin, testified that the Bank neither made the decision to refuse to give information nor gave advice on that decision. *See* Transcript pp. 133–34 (Civ.No.79– 1183, Sept. 20, 1979). Mr. Hess' testimony, however, was presented in a most hesitant and guarded manner and left us with the clear impression that someone connected with the Bank had threatened or had at least alluded to legal action against him personally if the appropriate course of action were not taken. *See* Transcript pp. 132 & 135 (Civ.No.79–1183, Sept. 20, 1979).

livestock and it is clearly in the public interest to give it a broad interpretation. *See* 7 U.S.C. § 196(a).

The Bank asserts in its brief that the claims of the interpleaded suppliers "are ordinary contract claims involving questions of State law and the application of State law with respect to contracts." Brief of the Bank, p. 5. This statement is incorrect. The claims before us arise only from federal law. This is not a state contract claim, but is a federally created right to bring a private action as the beneficiary of a statutory trust. *See In re Frosty Morn Meats, Inc.*, BK 77–31707, slip. op. at pp. 11, 17–19, and 30 (Bankr.Ct.M.D.Tenn., Aug. 31, 1978).

From the moment Martin accepted the livestock supplied by PACMA and the other suppliers, it was obligated under common law and hornbook law to pay for it. This is the debt that is controlled, as the Bank claims, by state law. Had Congress enacted nothing affecting the debts of packers to suppliers, we would not consider it a question of federal law. But Congress has enacted legislation specifically applying to these circumstances. The Act provides that this debt shall be fully satisfied before the close of the next business day following the purchase. 7 U.S.C. § 228b. If the supplier is not paid at that time, section 206 of the Act imposes the statutory trust on the packer's livestock and the proceeds derived therefrom. 7 U.S.C. § 196(b). And Section 308(a) of the Act has expanded the claims enforcible by private parties to include suits by an unpaid cash seller against a packer. 7 U.S.C. § 209(a). Congress has, through these sections of the Act, *added* to the state contract action a private cause of action to enforce the statutory trust. *Fillippo v. S. Bonaccurso & Sons, Inc.*, 466 F.Supp. 1008, 1016 (E.D.Pa.1978); *Hedrick v. S. Bonaccurso & Sons, Inc.*, 466 F.Supp. 1025, 1030 (E.D.Pa.1978). Both causes of action exists, but the one at hand is the federal claim on the statutory trust.

■ The critical language for our consideration therefore is in section 206:

All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock *until full payment has been received* by such unpaid sellers . . . .

7 U.S.C. § 196(b) (emphasis added). We hold that Congress intended that the "full payment" includes the principal amount (purchase price), prejudgment interest on that amount from the date following the delivery and acceptance of the livestock, and costs incurred by the suppliers in seeking to enforce their rights.

■ We base this holding on two independent rules of statutory construction. First, the Act is clearly remedial and is to be construed broadly to effect its purpose of protecting suppliers of livestock. *See In Re R & D Investments, Inc., supra*, BK 77–1225 & BK 77–1281, slip op. at pp. 5 & 6 (Bankr. Ct.M.D.Pa., Nov. 21, 1979); 7 U.S.C. § 196(a). That broad construction necessitates an expansive definition of "full payments" to give all possible protection to livestock suppliers. *See Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *Peyton v. Rowe*, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968).

■ Second, in section 409 of the Act, Congress provided a deadline for the payment of the purchase price for the livestock and used the following language:

Each packer, market agency, or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and transfer of possession thereof, deliver to the seller or his duly authorized representative the *full amount of the purchase price* . . .

7 U.S.C. § 228b (emphasis added). When Congress carefully includes a specific term in one section of a statute and excludes it from another, it should not be implied where excluded. *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972). *See also Novicki v. O'Mara*, 280 Pa. 411, 124 A.2d 672 (1924). In section 409 Congress

used the phrase "full amount of the purchase price" and in section 206 it used the phrase "full payment". We believe that, had Congress intended to limit the extent of the trust created by section 206, it would have used the specific phrase it had used elsewhere in the Act. The trust would then have existed until the *full amount of the purchase price* had been received by the supplier. Congress did not include that limitation on the trust, and we will not imply it.

The proposed stipulation of counsel on which we based our proposed order of June 2, 1980 made no reference to the costs of litigation and we received no objections from the suppliers concerning our omission of costs. We can only presume, therefore, that the claimants have waived their claims for either judgment or priority of costs against Martin.

### ORDER

AND NOW, this 16th day of July, 1980, in accordance with the accompanying memorandum of law this date filed and with our proposed order filed May 30, 1980, IT IS HEREBY ORDERED that:

(1) Judgment is entered in favor of each of the below–named claimants against Ezra Martin Company in the amount indicated as "Principal Amount" with interest thereon at the rate of 6% per annum from the date indicated, which is the day following the date of sale of livestock of each claimant, to the date of payment of the principal amount;

(2) The fund held by Ezra Martin Company at the American Bank shall be distributed to the claimants in the amount necessary to satisfy the 6% interest judgment entered in part (1), *supra*, the "Principal Amount" judgments having been satisfied by our orders of April 14, 1980 and April 28, 1980:

(3) All claims asserted in the above–captioned action except those granted in this order are denied and dismissed; and

(4) Our order filed on September 27, 1979, requiring that Ezra Martin Company retain the funds held in account 808–972–8 at American Bank, Greenfield Office, Lancaster, Pa., as the statutory trustee, is re-

scinded for any amount therein in excess of the amounts distributed in part (2), *supra*, and the balance remaining in said fund, if any, shall become subject to the claims of any and all creditors of Ezra Martin Company to the extent of their interests and priority therein.

The principal amounts of the judgments to be entered and the dates from which the interest judgment shall run are as follows:

| CLAIMANT | PRINCIPAL AMOUNT | INTEREST FROM |
|---|---|---|
| Pa. Agricultural Coop. Marketing Assn | $26,344.25 | 9–13–79 |
| Dennis Forry | 7,989.41 | 8–25–79) |
| Dennis Forry | 3,761.80 | 9–01–79) |
| Dennis Forry | 3,603.41 | 9–11–79) |
| Christian High | 78.21 | 8–29–79 |
| Leslie Landis | 4,963.49 | 8–29–79 |
| Leroy Martin | 3,873.09 | 9–06–79 |
| Franklin Hoover | 3,353.41 | 9–11–79 |
| James Kettering | 1,645.85 | 9–08–79) |
| James Kettering | 1,923.15 | 9–12–79) |
| Tri-Springs Farm | 1,022.85 | 9–11–79 |
| William Sloyer | 407.61 | 9–11–79 |
| Glenn Gockley | 819.79 | 9–12–79 |
| Vintage Sales Stables | 13,009.29 | 9–09–79 |
| Samuel Wengerd | 18,324.46 | 9–12–79 |