**Bill JACKSON and Juanita Jackson, Plaintiffs,**

**v.**

**SWIFT–ECKRICH, et al., Defendants.**

**Civ. No. 92–5133.**

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Aug. 11, 1993.

James G. Lingle, Lingle & Corley, Rogers, AR, Clay Fulcher, Strait Law Firm, Dardanelle, AR, for plaintiffs.

Charles Harwell, Cypert, Crouch, Clark & Harwell, Springdale, AR, for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This case is presently before the court on defendants' second motion for summary judgment. The action was filed on August 20, 1992. The plaintiffs entered into a series of one year contracts with Swift during the years 1986 through 1991. Pursuant to the contracts plaintiffs agreed to grow either hen

or tom turkeys and further agreed to purchase the turkey poults from Swift. Swift hired and controlled the catching and loading crew, the drivers, and the unloading crew.

As originally filed, the complaint asserted the following causes of action: breach of fiduciary duty; tort of outrage; breach of contract; misrepresentation and/or constructive fraud; breach of duty to deal fairly and in good faith; breach of implied warranty of merchantability and fitness for a particular purpose; and violation of the Packers and Stockyards Act, 7 U.S.C. § 192.

The defendants previously filed a motion to dismiss/motion for summary judgment. By letter opinion and order dated October 2, 1992, the court granted the first motion with respect to the breach of fiduciary duty claim and the claim for breach of the implied warranty of fitness for a particular purpose. The court also held the count alleging breach of duty of good faith and fair dealing was subsumed in the breach of contract claim. Subsequently, the plaintiffs dismissed their outrage claim.

The plaintiffs are currently alleging breach of contract, breach of the implied warranty of merchantability, fraud, negligence, and violations of the Packers and Stockyards Act. Defendants have moved for partial summary judgment on each claim with the exception of the negligence claim. After defendants filed the instant summary judgment motion, plaintiffs were given leave to file an amended complaint. The amended complaint was filed on August 2, 1993.

### Misrepresentation/Constructive Fraud.

Defendants contend they are entitled to judgment as a matter of law on plaintiffs misrepresentation or constructive fraud claims for three separate reasons.[1] First, defendants contend plaintiffs have failed to satisfy all the required elements to support a claim for fraud. Second, defendants argue that the alleged acts forming the basis of these claims occurred more than three years prior to the commencement of this action; therefore defendants argue these claims are barred by the statute of limitations. Third,

defendants argue that the plaintiffs by continuing to enter into grower contracts after discovering the alleged misrepresentations, waived their right to assert a claim based on fraud.

In Arkansas, common law fraud has five elements: (1) a false representation, usually of a material fact; (2) knowledge or belief by the defendant that the representation is false or that he lacks a sufficient basis of information to make the statement, that is, the scienter requirement; (3) intent to induce the plaintiff to act or to refrain from acting in reliance upon the representation; (4) justifiable reliance by the plaintiff upon the representation; and (5) resulting damage to the plaintiff. Howard W. Brill, *Arkansas Law of Damages* § 35–7 at 489 (2d Ed.1990). Arkansas also recognizes a cause of action for legal or constructive fraud. Professor Brill summarizes this cause of action as follows:

This cause of action, which would be described as innocent misrepresentation or non-disclosure in other jurisdictions, exists even though any evil intention or moral wrong is absent. The action may be based on a mistake of fact. The essential element is that a legal or equitable duty has been breached in such a way that the law declares that breach to be fraudulent because of its tendency to deceive others, regardless of the moral guilt or intent of the fraud-feasor. Although liability may be based on a false statement honestly believed to be true, the mere expression of an opinion cannot be the basis for constructive fraud.

*Id.* at 492.

Under Arkansas law, a cause of action for fraud is governed by a three-year statute of limitations. Ark.Code Ann. § 16–56–105 (1987). *See also Burton v. Tribble*, 189 Ark. 58, 70 S.W.2d 503 (1934) (three year statute applies to all tort actions). In *Dupree v. Twin City Bank*, 300 Ark. 188, 777 S.W.2d 856 (1989) the court stated:

As to fraud or misrepresentation, mere ignorance of one's rights does not prevent the running of the statute of limitations or

---

1. The amended complaint filed on August 2, 1993, asserts in count four a cause of action for fraud and in count five a cause of action for misrepresentation/constructive fraud.

laches, unless such ignorance is due to fraudulent concealment or misrepresentation on the part of those invoking the benefit of the statute. While an action for fraud must be brought within three years from the date the cause of action accrues, the fraud does suspend the running of the statute of limitations and the suspension remains in effect until the party having the cause of action discovered the fraud or should have discovered it by the exercise of reasonable diligence.

*Id.* at 191–92, 777 S.W.2d 856 (citations omitted).

■ "[T]he test for the statute of limitations for fraud is not a subjective one, i.e. when the fraud was discovered or *should have been discovered....*" *Id.* at 192 n. 2, 777 S.W.2d 856. The question that arises is whether the plaintiff used due diligence. *Talbot v. Jansen,* 294 Ark. 537, 744 S.W.2d 723 (1988). The burden is on the plaintiff to exercise due diligence to discover the fraud if apprised of facts which should place the plaintiff on notice. "Affirmative action on the part of the person charged with fraud to conceal a plaintiff's cause of action will toll the running of the statute of limitations." *Hughes v. McCann,* 13 Ark.App. 28, 31, 678 S.W.2d 784 (1984).

In count four of the complaint plaintiffs allege defendants made the following misrepresentations which were false: that the condemned parts for which the plaintiffs were charged were accurately weighed; that the birds which were dead on arrival were accurately weighed; that payments were figured according to the formula set in the contract when in fact payments were improperly figured because of improper weighing, misstatement of poult prices, improper charging of condemnation and downgrading to the growers; and that the condemned carcass deduction was accurately calculated. Plaintiffs allege that the statements constituted a continuing course of conduct throughout the contract period. In count five, misrepresentation or constructive fraud, plaintiffs allege that when they entered into their contract with Swift, Swift's agents promised plaintiffs that the contract terms would not change for a period of five years.

Defendants first argue that the statute of limitations bars the suit on the alleged guarantee to provide birds for five years under the terms of the original contract without modifications. It is the defendants' contention that the plaintiffs knew as early as September of 1986, the date the second contract was signed, that the alleged guarantee of Swift to supply contracts with unchanging terms was not being honored. Defendants point out that plaintiffs arguably had this knowledge even earlier; plaintiffs received a letter dated June 28, 1985, from defendant Wolf stating that plaintiffs would be offered the standard growing contract at the beginning of the 1986, 1987, and 1988, growing seasons. In opposition, plaintiffs admit that the initial representations were made by Swift more than three years before the action was filed. Plaintiffs, however, contend that continuing misrepresentations were made throughout the contract period as set forth in plaintiffs' August 2, 1993, amended complaint.

Defendants have submitted portions of the deposition of Bill Jackson as an exhibit to the motion. At his deposition Bill Jackson was asked about the June 28, 1985, letter and conceded that the letter was at variance with the verbal assurances given by Wolf because it set forth a three-year deal and not a "five-year deal that he assured me of." *Deposition of Bill Jackson* at p. 55.

Beginning at page 46, Bill Jackson states the contract changed after the first year:

Q: When did Swift first change their contract:

A: The first change was in the second year that I grew turkeys.

\*     \*     \*     \*     \*     \*

Q: I'm just trying to get this straight in my mind. The first contract you signed was to take you from September of '85 to August of '86; right?

A: Uh-huh.

Q: So the next contract that you signed was the one that they changed and gave you less favorable terms?

A: Yes.

\*     \*     \*     \*     \*     \*

Q: All right. So a year after you signed the first contract, then you knew that whatever representation that was made by Mr. Wolf a year before turned out to be inaccurate or incorrect or maybe a plain lie; is that true?

A: Probably.

*Deposition of Bill Jackson* at pp. 46–47. Jackson testified that contract modifications continued to occur:

Q: Let me ask you generally, in this way. Is it your contention that after the September of 1987 contract, that each contract after that that you signed or your wife signed with Swift changed?

A: Yes.

Q: None of the subsequent contracts were the same?

A: No.

Q: They were all, in your opinion, to your detriment?

A: Yes.

*Id.* at pp. 62–63.

■ With respect to the alleged representation that the terms of the contract would not change for a period of five years, the court finds the plaintiffs' misrepresentation and/or constructive fraud claims are time barred. By their own admission, plaintiffs knew the contract terms were being changed more than three years prior to the filing of this suit. As this appears to be the only allegation of count five, the court grants defendants' motion for summary judgment on count five.

■ Defendants also move for summary judgment on statute of limitations grounds for the following alleged misrepresentations: promise to provide disease-free birds; defendants' guarantee that plaintiffs would only receive poults from one source; and the promise of increasing profits. Plaintiffs in their amended complaint do not appear to include these alleged misrepresentations in

their fraud claim. Accordingly, the court will not address these points.[2]

■ With respect to the fraudulent allegations made in count four of the August 2, 1993 amended complaint, each appears to represent a continuing course of conduct. The court cannot determine from the record before it whether the claims set forth in count four are time barred. Thus, the motion for summary judgment in respect to these allegations of the complaint is denied.

### Breach of Warranty.

■ Count three of the complaint alleges a claim for breach of an implied warranty of merchantability. Specifically, plaintiffs allege that under the terms of the contract they were required to purchase their poults from Swift and that they relied on Swift to choose healthy, well-bred poults that would live to be Grade A turkeys. Plaintiffs contend Swift "consistently sold plaintiffs poults, especially from the Russellville hatchery, that were infected with disease and that were genetically inferior; once in the growers' facilities, the rate of death, disease, and physical problems was abnormally high." Plaintiffs contend the poults were not of merchantable quality.

Defendants contend the breach of warranty claim must be dismissed for three reasons. First, defendants state the plaintiffs failed to give the proper notice of breach of an implied warranty as required by statute. Second, defendants argue the plaintiffs have failed to properly plead notice in their complaint.[3] Third, defendants contend the claim is barred by the applicable statute of limitations.

■ To recover for breach of an implied warranty of merchantability, the plaintiffs must prove: (1) that they sustained damages; (2) that the goods sold to them were not merchantable, *i.e.*, fit for the ordinary purpose for which such goods are used; (3) that the unmerchantable condition was a proxi-

---

**2.** The court also finds it unnecessary to address defendants' argument that plaintiffs have failed to state a claim with regard to these alleged misrepresentations. Nor, does the court find it necessary to address defendants' waiver arguments.

**3.** In the August 2, 1993, complaint plaintiffs allege they repeatedly gave notice of this breach to defendant.

mate cause of the plaintiffs' damages; and (4) that the plaintiffs were persons whom the defendants might reasonably expect to use or be affected by the goods. *E.I. Du Pont de Nemours & Co. v. Dillaha,* 280 Ark. 477, 659 S.W.2d 756 (1983). *See also* Ark.Code Ann. § 4–2–314 (Repl.1991). With respect to the sale of poultry, "there shall be no implied warranty that the animals are free from disease or sickness. This exemption shall not apply when the seller knowingly sells animals which are diseased or sick." Ark.Code Ann. § 4–2–316(3)(d)(ii) (Repl.1991).

When the goods have been accepted, the code requires notice to be given. Specifically, Ark.Code Ann. § 4–2–607(3)(a) provides where a tender has been accepted "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy...."

A seller has notice of a breach when: (1) he has actual knowledge of it; or (2) he has received a notice or notification of it; or (3) from all the facts and circumstances known to the seller at the time in question he has reason to know that it exists. Ark.Code Ann. § 4–1–201(25). A seller receives a notice or notification when: (1) it comes to his attention or; (2) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications. Ark.Code Ann. § 4–1–201(26).

▮ The "purpose of the statutory requirement of notice to the seller of breach of warranty is to enable the seller to minimize damages in some manner, such as correcting the defect, and also to give the seller some immunity against stale claims." *L.A. Green Seed Company v. Williams,* 246 Ark. 463, 468, 438 S.W.2d 717 (1969).

> [T]he requirements of notification are not stringent. Notice need only be sufficient to inform the seller that the transaction is claimed to involve a breach and thus to open the way for negotiation of a normal settlement. It must, however, be sufficient to let the seller know that the transaction is still troublesome and must be watched.... The intent of the provision, however, is that the seller be informed that

the buyer proposes to look to him for damages for breach. The notice must be more than a complaint. It must, either directly or inferentially, inform the seller that the buyer demands damages upon an asserted claim of breach of warranty.

*Cotner v. International Harvester Co.,* 260 Ark. 885, 889, 545 S.W.2d 627 (1977). *See also James A. Rogers Excavating v. R.A. Young & Son,* 3 Ark.App. 297, 299, 625 S.W.2d 560 (1981). "Of course, the sufficiency of notice and what is considered to be a reasonable time within which to give notice of breach of warranty are ordinarily questions of fact for the jury, based upon the circumstances of each case." *L.A. Green,* 246 Ark. at 468, 438 S.W.2d 717.

No particular form of notice is required and the notice need not be in writing. *See generally* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 11–10 at 558–59 (3d Ed.1988). Comment four to section 4–2–607 addresses both the reasonableness of the notice and the necessary contents of the notice and provides:

> The time of notification is to be determined by applying commercial standards to a merchant buyer. "A reasonable time" for notification from a retail consumer is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.

> The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyers, as under the section covering statements of defects upon rejection. Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to remedy. The notification which saves the buyer's rights under this Article (Chapter) need only be such as informs the seller that the transaction is claimed to involve a breach, and thus

opens the way for normal settlement through negotiation.

Defendants assert that they were not put on notice that plaintiffs were demanding damages for breach of warranty and were never told orally or in writing that a breach of warranty claim was being asserted. Defendants appear to believe more is required than is indicated by the code itself. The above quoted commentary specifically states there is no reason for requiring the notification to be a claim for damages or a threat of litigation. The notice must only "be sufficient to let the seller know that the transaction is still troublesome and must be watched."

Defendants refer the court to the deposition of Bill Jackson. At pages 101 and 102 the quality of the poults is discussed:

A: But we talked many times on these poults with Russ May. I talked to him many times—many times with Russ May on poults.

Q: Was it Russ May that you normally talked to about the quality of the poults?

A: Yes, and sometimes Wolf and Dennis Griggs.

Q: What did you tell them?

A: You know, they would come out, and we would show them what the problem was.

Q: What did you ask them to do about it?

A: All they could.

Q: Just try to help you?

A: Help me all they could.

Q: Did you ever threaten to sue them?

A: No.

Q. You never—

A: Wolf told me to a few times.

Q: Told you to sue him?

A: Yes.

Q: Did you ever say to Wolf or May or Griggs or anybody at Swift that you were going to hold them responsible for the poor quality poults?

A: No, but I've almost got down on my knees and begged them to send me good quality poults.

In addition to the oral complaints made to Russ May on numerous occasions, plaintiffs advise the court that the plaintiffs did notify the defendants of poult mortality after every poult delivery as required by the warranty language on the poult invoices. Plaintiffs additionally attach pages of the Jackson deposition which indicate that he and Russ May had run-ins regarding "poults and settlement and trying to get him to give me some credit for sick birds...." *Deposition of Bill Jackson* at 163. The court believes material questions of fact remain regarding this issue.

Next, defendants argue that any claim by the plaintiffs for diseased poults prior to August 20, 1988, is barred by the statute of limitations. Ark.Code Ann. § 4–2–725 provides:

(1) An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued....

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

This action was filed on August 20, 1992. Clearly defendants are correct in their assertion that any warranty claim based on poults delivered prior to August 20, 1988, is barred.

Defendants additionally argue that the breach of warranty claims stemming from poult deliveries after August 20, 1988, must fail because the plaintiffs failed to submit their claims within 30 days after delivery as required by the limited warranty. The standard invoices for the poults contain the following warranty provisions:

In the production of these poults the seller attempted to follow approved and recommended methods of flock control and egg selection and has operated its hatchery according to established sanitary and disease control standards. However, seller

does not warrant these poults to be free from any disease, the existence of which was not readily apparent at the time of sale. We guarantee safe arrival in good condition of all poults purchased. Buyer must examine shipment carefully at the time of arrival and if the poults are not in satisfactory condition, this should be indicated on the delivery ticket. If mortality occurs following delivery on which a claim is to be filed, the seller must be notified at the time these losses are occurring. **All claims for losses must be submitted in writing within 30 days after delivery.** In all cases our liability is limited to the purchase price of the poults. We assume no liability for mortality due to piling, drowning, debeaking, cannibalism, litter consumption and other management factors over which we have no control.

Plaintiffs oppose this portion of the motion arguing that they submitted, as did all Swift growers, fourteen day mortality claims. Moreover, plaintiffs argue the limitation of warranty is only applicable to an express warranty and not to an implied warranty. Thus, plaintiffs contend they were under no time constraints as to submitting a claim for breach of the implied warranty of merchantability.

Ark.Code Ann. § 4-2-316 provides for the exclusion or modification of warranties. With respect to the implied warranty of merchantability, that section provides:

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it, the language must mention merchantability and in case of writing must be conspicuous ...

(3) Notwithstanding subsection (2):

(a) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(b) When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is

no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(c) An implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

\*   \*   \*   \*   \*   \*

(d)(ii) With respect to the sale of ... poultry, there shall be no implied warranty that the animals are free from disease or sickness. This exemption shall not apply when the seller knowingly sells animals which are diseased or sick.

(4) Remedies for breach of warranty can be limited in accordance with the provisions of this chapter on liquidation or limitation of damages and on contractual modification of remedy (§§ 4-2-718, 4-2-719).

"[T]his provision applies to attempts to modify (for example by setting a time limit) as well as to attempts fully to exclude implied warranties." 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 12-5 (3d Ed.1988). The court finds that the language contained on Swift's standard invoices, *quoted supra*, is insufficient to exclude or modify the implied warranty of merchantability. Thus, the 30 day time limitation does not apply to the implied warranty of merchantability claim.

Finally, defendants argue that at the very least plaintiffs are limited in their recovery for breach of warranty to the purchase price of the poults and are not entitled to recover lost profits. *See supra the language from Swift's standard form invoice.* By its terms the warranty language limits the buyer's remedy to the purchase price of the poults. Ark.Code Ann. § 4-2-719 provides for the contractual modification or limitation of remedy. The section provides in part that "[t]he agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter...." Ark.Code Ann. § 4-2-719.

Plaintiffs argue that this limitation only applies to an express warranty. Plaintiffs appear to confuse the code provisions which allow exclusions or disclaimers of warranties,

Ark.Code Ann. § 4–2–316, with the provisions allowing a limitation of remedies, Ark. Code Ann. § 4–2–719. As Professors White & Summers point out, section 2–719 which plays the dominant role in limiting a buyer's remedies is easily confused with 2–316's exclusion of warranties. 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 12–8 at p. 596 (3d Ed.1988). In discussing the distinction between the two provisions, Professors White & Summers state:

> Part of the confusion undoubtedly arises from a failure to distinguish between warranty disclaimers and remedy limitations or exclusions. A disclaimer clause is a device used to control the seller's liability by reducing the number of situations in which the seller can be in breach. A remedy limitation or exclusion, on the other hand, restrict the remedies available to one or both parties once a breach is established. Assume, for example, that a new-car buyer sues for breach of warranty, and the seller raises defenses based on disclaimer and limitation or exclusionary clauses. The disclaimer defense denies the existence of any cause of action. An exclusionary-clause defense, on the other hand, denies that the buyer is entitled to the remedy he demands—for example, consequential damages.

*Id.* at § 12–11 pp. 606–07.

The provision in question clearly limits the buyer's remedies to the purchase price of the poults. As plaintiffs have presented no argument that the warranty fails of its essential purpose or is unconscionable, the court finds that the remedy limitation applies.

### Counterclaim.

Swift filed a counterclaim seeking payment of $15,384.00 reflecting advances of monies for turkey poults made while plaintiffs were contract growers with Swift. Plaintiffs contend they are entitled to an offset against the poult debt, due to diseased and sick poults. The court will take this portion of the motion under advisement to be determined at the trial of this matter.

### Breach of Contract.

With respect to the contract claim plaintiffs allege Swift consistently failed to provide the plaintiffs with the agreed upon number of placements and total poults for each year; refused to admit responsibility for turkeys which were dead on arrival (DOA's) at the processing plant and refused to deduct DOA's from the total weight of turkeys for which the plaintiffs were paid; refused to recognize that downgrading of the turkeys was occurring because of the actions of the catch crews; failed to state in the contracts which party is liable for condemnation or downgrading resulting from loading, hauling, or plant errors as required by regulation; and generated settlement statements containing numerous miscalculations resulting in Swift's failure to fully compensate plaintiffs.

Defendants contend the plaintiffs have waived their right to bring this claim by continuing to operate under the terms of their grower contract, receiving benefits from it, and requiring performance by defendants. More notably, defendants point out that plaintiffs continued to renew the contracts on an annual basis. Plaintiffs argue that although they continued to grow turkeys pursuant to their contract with Swift after the alleged breaches had occurred, they did so only because they had no reasonable alternative. Plaintiffs ask the court to consider the reality of the situation as it exists between a grower and the company for which the grower produces. In particular, plaintiffs contend they are dependent on the company and that the contracts and the interpretations thereof are a "take it or leave it proposition."

Moreover, plaintiffs state several of the actions complained of were not apparent to the plaintiffs until after they ceased producing for the Swift. It is argued that as the contracts at issue are governed by the Packers and Stockyards Act defendants cannot be permitted to argue that the plaintiffs have waived actions prohibited by federal law.

"The rule is that a party to a contract who, with knowledge of a breach by the other party, continues to accept benefits under the contract and suffers the other party to continue in performance thereof,

waives the right to insist on the breach." *Stephens v. West Pontiac–GMC, Inc.*, 7 Ark. App. 275, 278, 647 S.W.2d 492 (1983). *See also Southern Pipe Coating, Inc. v. Spear & Wood Mfg. Co.*, 235 Ark. 1021, 363 S.W.2d 912 (1963). "Waiver is the voluntary abandonment or surrender by a capable person of a right known by him to exist, with the intent that he shall forever be deprived of its benefits. *Bethell v. Bethell*, 268 Ark. 409, 420, 597 S.W.2d 576 (1980); *Bright v. Gass*, 38 Ark. App. 71, 77, 831 S.W.2d 149 (1992). The defense of waiver is an affirmative defense which must be specifically pled. *Ward v. Russell*, 32 Ark.App. 86, 796 S.W.2d 588 (1990). Ordinarily, whether a waiver occurs is an issue of fact. *Id.*

The court believes issues of fact remain regarding the alleged breaches and whether the plaintiffs waived said breaches. This portion of the motion is denied.

### Packers and Stockyards Act.

■■■ This court previously ruled that the clear and express language of § 209 of the Packers and Stockyards Act (PSA) provides for the maintenance of an action in district court. 7 U.S.C. § 209. *See also Baldree v. Cargill, Inc.*, 758 F.Supp. 704 (M.D.Fla.1990), *aff'd without opinion*, 925 F.2d 1474 (11th Cir.1991); *Gerace v. Utica Veal Co., Inc.*, 580 F.Supp. 1465, 1469 (N.D.N.Y.1984). The Packers and Stockyards Act, however, contains no statute of limitations for private actions brought pursuant to § 209. 7 U.S.C. § 209(b).

Generally when a federal act does not contain its own statute of limitations the federal court's look to the most analogous statute of the forum state. In *Lampf v. Gilbertson*, —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) the Supreme Court reviewed in some detail the state-borrowing doctrine and when departures from the doctrine are warranted. As the court believes the framework set forth by the Supreme Court in *Lampf* will be helpful, we will quote *Lampf* in some detail. The Court stated:

It is the usual rule that when Congress has failed to provide a statute of limitations for a federal cause of action, a court "borrows" or "absorbs" the local time limitation most analogous to the case at hand. This practice, derived for the Rules of Decision Act, 28 U.S.C. § 1652, has enjoyed sufficient longevity that we may assume that, in enacting remedial legislation, Congress ordinarily "intends by its silence that we borrow state law."

The rule, however, is not without exception. We have recognized that a state legislature rarely enacts a limitations period with federal interests in mind, and when the operation of a state limitations period would frustrate the policies embraced by the federal enactment, this Court has looked to federal law for a suitable period. These departures from the state-borrowing doctrine have been motivated by this Court's conclusion that it would be "inappropriate to conclude that Congress would choose to adopt state rules at odds with the purpose or operation of federal substantive law."

Rooted as it is in the expectations of Congress, the "state-borrowing doctrine" may not be lightly abandoned. We have described federal borrowing as "a closely circumscribed exception," to be made "only 'when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking.' "

Predictably, this determination is a delicate one. Recognizing, however, that a period must be selected, our cases do provide some guidance as to whether state or federal borrowing is appropriate and as to the period best suited to the cause of action under consideration. From these cases we are able to distill a hierarchical inquiry for ascertaining the appropriate limitations period for a federal cause of action where Congress has not set the time within which such an action must be brought.

First, the court must determine whether a uniform statute of limitations is to be selected. Where a federal cause of action tends in practice to "encompass numerous and diverse topics and subtopics," such that a single state limitations period may

not be consistently applied within a jurisdiction, we have concluded that the federal interest in predictability and judicial economy counsel the adoption of one source, or class of sources, for borrowing purposes. This conclusion ultimately may result in the selection of a single federal provision, or of a single variety of state actions.

Second, assuming a uniform limitations period is appropriate, the court must decide whether this period should be derived from a state or a federal source. In making this judgment, the court should accord particular weight to the geographic character of the claim:

> "The multistate nature of [the federal cause of action at issue] indicates the desirability of a uniform federal statute of limitations. With the possibility of multiple state limitations, the use of state statutes would present the danger of forum shopping and, at the very least, would 'virtually guarantee[e] ... complex and expensive litigation over what should be a straightforward matter.'"

Finally, even where geographic considerations counsel federal borrowing, the aforementioned presumption of state borrowing requires that a court determine that an analogous federal source truly affords a "closer fit" with the cause of action at issue than does any available state-law source. Although considerations pertinent to this determination will necessarily vary depending upon the federal cause of action and the available state and federal analogues, such factors as commonality of purpose and similarity of elements will be relevant.

*Lampf*, —— U.S. at ——, 111 S.Ct. at 2778–79 (citations and footnotes omitted). The

court went on to state "[w]hen the statute of origin contains comparable express remedial provisions, the inquiry usually should be at an end. Only where no analogous counterpart is available should a court then proceed to apply state-borrowing principles." *Id.*, —— U.S. at ——, 111 S.Ct. at 2780. The *Lampf* case involved the appropriate statute of limitations to be applied to 10b–5 causes of action, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1990).

The parties have not cited, nor has the court's own independent research revealed, any reported decisions in which a court adopted a statute of limitations for § 209 actions. Defendants urge the court to depart from the state-borrowing doctrine contending that Arkansas has no statute that is analogous to that found in the PSA. Defendants argue the appropriate limitations period is the two year statute of limitations found in the Agricultural Fair Practices Act (AFPA), 7 U.S.C. § 2301 *et seq.* Defendants point out that the AFPA appears in the same title as the PSA and deals specifically with unfair trade practices affecting producers of agricultural products. Defendants illustrate the close analogy between the two statutes by informing the court that preventing or discouraging a producer from participating in a cooperative association would also be viewed as an unfair, unjustly discriminatory, and deceptive practice and devise in violation of § 192(a) of the PSA. *See Baldree v. Cargill*, 758 F.Supp. 704 (M.D.Fla.1990)[4].

In response, plaintiffs argue that the appropriate statute of limitations is found in the Arkansas Unfair Practices Act, Ark.Code Ann. § 4–75–201, *et seq.*[5] As the Arkansas Unfair Practices Act contains no statute of limitations, the appropriate statute under Arkansas law is the five year statute set forth

---

4. *Baldree* involved a decision of Cargill, Inc., to terminate its poultry growing arrangement with the President of the Northeast Florida Broiler Growers' Association, Arthur Gaskins. The poultry growers argued that Cargill terminated Gaskins to discourage and prevent Gaskins from supporting the Association. The court in ruling on a motion for preliminary injunction found a likelihood of success on the merits on the claims that the termination constituted (1) an unfair, unjustly discriminatory and deceptive practice and device in violation of 7 U.S.C. § 192(a); (2) an undue and unreasonable prejudice and disad-

vantage in violation of 7 U.S.C. § 192(b); and (3) coercion, intimidation and discrimination against agricultural producers based on their exercise of their legal rights to affiliate with an association of producers in violation of 7 U.S.C. § 2303.

5. With the exception of the Arkansas Catfish Processor Fair Practices Act of 1987, Ark.Code Ann. § 2–6–101 *et seq.*, the plaintiffs inform the court that there is no state statute protective of agricultural producers.

in Ark.Code Ann. § 16–56–115. In the alternative, plaintiffs argue that the other most analogous statute under state law is the five year statute of limitations for a written contract. Plaintiffs argue the PSA and its regulations are an integral, even if unwritten, part of every contract between a live poultry dealer and a poultry grower. *See e.g.,* 9 C.F.R. § 201.100 *et seq.* It is pointed out that the nature of the PSA claims at issue in this case are intertwined with the contracts entered into between the plaintiffs and Swift. Even if the court chooses to apply a federal statute plaintiffs argue the AFPA is not the appropriate statute. Rather, plaintiffs suggest the Robinson Patman Act, the Sherman, Clayton, and Fair Trade Commission Acts.

On August 9, 1993, defendants filed a reply to plaintiffs response. In this reply, the defendants argue that if the court feels compelled to adopt a state statute of limitations it should be the three year statute for implied contracts or the three year statute for fraud and deceit.

Section 209 of the Packers and Stockyards Act sets forth two methods of enforcement. First, an aggrieved party may file a complaint with the Secretary pursuant to § 210. 7 U.S.C. § 209(b). Section 210 states "[a]ny person complaining of anything done or omitted to be done ... may, at any time within ninety days after the cause of action accrues, apply to the Secretary by petition...." 7 U.S.C. § 210(a). If the Secretary determines that the complainant is entitled to an award of damages the Secretary issues an order directing the defendant to pay the complainant on or before a day named. 7 U.S.C. § 210(e). If the defendant does not comply with the order, the complainant may file suit in district court within one year of the date of the order. 7 U.S.C. § 210(f). Alternatively, an aggrieved party may file suit in district court. 7 U.S.C. § 209(b).

"As originally enacted in 1921, the purpose of the Packers and Stockyards Act was to combat anticompetitive and unfair practices in the highly concentrated meat packing industry." *United States v. Perdue Farms, Inc.,* 680 F.2d 277, 280 (2d Cir.1982) *citing* H.R.Rep. No. 77, 67th Cong. 1st Sess. (1921); *Stafford v. Wallace,* 258 U.S. 495, 499–501, 42 S.Ct. 397, 399–400, 66 L.Ed. 735 (1922). In 1934 the Act was amended to include within its scope virtually all live poultry dealers and handlers. The articulated purpose for the legislation was codified at 7 U.S.C. § 218. The Poultry Producers Financial Protection Act of 1987, repealed section 218, and amended the Packers and Stockyards Act in various respects including the enactment of statutory trust provisions for the purpose of protecting the poultry growers from inadequate financing arrangements. *See In re Roxford Foods Litigation,* 790 F.Supp. 987, 989 (E.D.Cal. 1991); 7 U.S.C. § 197(a) & (b).

The "Act is clearly remedial and is to be construed broadly to effect its purpose of protecting suppliers of livestock." *Pennsylvania Agr. Cooperative Marketing Assoc. v. Ezra Martin Co.,* 495 F.Supp. 565, 570 (M.D.Pa.1980). *See also Farrow v. United States Dept. of Agr.,* 760 F.2d 211, 214 (8th Cir.1985). It has been noted that "[s]even U.S.C. § 213(a) and 7 U.S.C. § 192(a), which deals with the behavior of packers and poultry dealers and handlers, authorize the Secretary of Agriculture to regulate anticompetitive trade practices in the livestock and meat industry in accord with 'the basic antitrust blueprint of the Sherman Act and other preexisting antitrust legislation such as the Clayton Act and the Fair Trade Commission Act.'" *Farrow v. United States Dept. of Agr.,* 760 F.2d 211, 214 (8th Cir.1985).

Plaintiffs allege Swift engaged in unfair, unjustly discriminatory, or deceptive practices in violation of § 192(a) of the Packers and Stockyard Act. Section 192(a) provides:

> It shall be unlawful for any packer with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or any live poultry dealer with respect to live poultry, to:
>
> (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or devise.

7 U.S.C. § 192(a).

In particular, plaintiffs allege the following unfair, discriminatory, and deceptive acts: failing to promptly weigh the turkeys at the processing plant allowing a loss of weight and a decrease in the compensation due

plaintiffs; offering more profitable contracts to different growers; terminating independent growers in 1992 without economic justification; penalizing growers for downgrading caused by Swift's loading and catching crews, haulers, and processing personnel; deducting a condemned carcass weight derived by multiplying the number of condemned heads times the average weight when the actual weight of the condemned carcasses was consistently less; charging plaintiffs a higher price for poults than allowed by the contract and in failing to use the actual price charged in determining the poult cost factor on the settlement sheet; failing to timely pay the plaintiffs; and failing to properly record and weigh the birds delivered to the plant.

The Arkansas Unfair Practices Act's stated purpose is "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented." Ark.Code Ann. § 4–75–202 (Repl.1991). The Act provides for the imposition of criminal penalties, Ark.Code Ann. § 4–75–204, as well as for civil actions for injunctive relief and/or damages, Ark.Code Ann. § 4–75–211.[6] The Act itself contains no limitation period which results in the application of the general catch-all five year statute found in Ark.Code Ann. § 16–56–115.

The court does not believe it would be appropriate to look to the Arkansas Unfair Practices Act which does not itself contain its own statute of limitations. The court cannot say that this local time limitation is the most analogous to the case at hand; nor can the court say that the limitations period was adopted after consideration of policies closely analogous to those considered in the PSA. The five year catch-all statute of limitations is just that—it applies to any Act or cause of action which does not specify its own limita-

tion period and cannot be said to be covered by the specific one year, Ark.Code Ann. § 16–56–104, three year, Ark.Code Ann. § 16–56–105, statutory penalties, Ark.Code Ann. § 16–56–108, or actions against sheriffs, coroners, and other officials, Ark.Code Ann. § 16–56–109, statutes.

Nor does the court believe it is appropriate to adopt the Arkansas limitation period for contracts or implied contracts. While it is true that the parties at issue entered into a written growers contract and that regulations promulgated pursuant to the PSA regulate the contents of the contracts and certain actions taken thereunder, the PSA purposes and terms are much broader than this. The gist of the action or the essential nature of the plaintiffs' claims in this case may be as plaintiffs argue intertwined with the written contractual provisions of the growers contract. However, the provisions of the PSA and the policies behind its enactment and the various amendments to it as well as the regulations promulgated pursuant to the PSA are much broader than a breach of contract claim.

Thus, of the proposed state statute of limitations suggested by the parties the court finds none "which best effectuates the federal policy at issue." *See e.g. Vanderboom v. Sexton,* 422 F.2d 1233 (8th Cir.1970), *cert. denied,* 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). The court believes this is one of the exceptional cases described in *Lampf* that calls for an exception to the state-borrowing rule and the adoption of a uniform federal statute of limitations for actions brought under § 209.

We turn first to the provisions of the AFPA. The AFPA was enacted by Congress to protect the right of farmers and other producers of agricultural commodities to join cooperative associations through which to market their products.[7] *See Michigan Can-*

---

**6.** Defendants argue the Arkansas Unfair Practices act is not a close relative to the PSA because it encompasses theft of trade secrets (subchapter 6), unfair cigarette sales (subchapter 7), and a provision to establish fair and open procedures for the bidding and negotiation of motion pictures (subchapter 9). While these subchapters are included in the same chapter of the Arkansas

Code, chapter 25 which generally covers unfair practices, the Unfair Practices Act itself is comprised of only subchapter 2 of chapter 25. *See* Ark.Code Ann. § 4–75–201 (Repl.1991).

**7.** Plaintiffs argue, in part, that this is not the most analogous statute because the law has not

ners & Freezers Assoc., Inc. v. Agricultural Marketing & Bargaining Bd., 467 U.S. 461, 464, 104 S.Ct. 2518, 2520, 81 L.Ed.2d 399 (1984). The declaration of policy provides:

> Agricultural products are produced in the United States by many individual farmers and ranchers scattered throughout the various States of the Nation. Such products in fresh or processed form move in large part in the channels of interstate and foreign commerce, and such products which do not move in these channels directly burden or affect interstate commerce. The efficient production and marketing of agricultural products by farmers and ranchers is of vital concern to their welfare and to the general economy of the Nation. Because agricultural products are produced by numerous individual farmers, the marketing and bargaining position of individual farmers will be adversely affected unless they are free to join together voluntarily in cooperative organizations as authorized by law. Interference with this right is contrary to the public interest and adversely affects the free and orderly flow of goods in interstate and foreign commerce.
>
> It is, therefore, declared to be the policy of Congress and the purpose of this chapter to establish standards of fair practices required of handlers in their dealings in agricultural products.

7 U.S.C. § 2301. Actions under the AFPA must be commenced within two years after the cause of action accrued. 7 U.S.C. § 2305(c).

The Act provides that it is "unlawful for either a processor or producers' association to engage in practices that interfere with a producer's freedom to choose whether to bring his products to market himself or to sell them through a producers' cooperative association." Michigan Canners & Freezers Assoc., Inc. v. Agricultural Marketing & Bargaining Bd., 467 U.S. 461, 464, 104 S.Ct. 2518, 2520, 81 L.Ed.2d 399 (1984). The act protects producers from economic coercion. Id.

proven to be of much help to farmers. The court

The AFPA is narrow in its scope and was enacted to protect the right of farmers and other producers of agricultural commodities to join cooperative associations without running afoul of the anti-trust acts. The court does not believe this is the most analogous federal statute.

Keeping in mind the principles set forth in Lampf and quoted above, the court believes that the appropriate statute of limitations is the four-year limitation provision found in the Sherman Anti-trust Act, 15 U.S.C. § 15b. The court believes the anti-trust act affords a closer fit with the PSA than do any of the state law causes of action considered by the court or the AFPA. Both acts are aimed at regulating anticompetitive trade practices. As the court in Farrow noted, the provisions of the PSA are in accord with the basic antitrust blueprint of the Sherman Act. Farrow, 760 F.2d at 214. Therefore, the court will "borrow" or "subsume" and apply to the PSA allegations of the complaint the four year statute of limitations period provided by 15 U.S.C. § 15b. Accordingly, any PSA claims stemming from actions taken before August 20, 1988, are barred.

### Punitive Damages.

Finally, defendants request entry of judgment as a matter of law on plaintiffs' claims for punitive damages. The court will deny this portion of the motion. The court will determine at the time of trial whether the evidence is such that the issue of punitive damages will be allowed to go to the jury.

A separate order in accordance herewith will be concurrently entered.

### ORDER

On this 11th day of August, 1993, came on for consideration the defendants' motion for summary judgment and the plaintiffs' response thereto. The court finds for the reasons stated in a memorandum opinion of even date that the motion should be granted in part and denied in part. Specifically, the court grants the motion with respect to the following claims:

finds no merit in this position.

1. The motion for summary judgment is granted with respect to the allegations of count five of the amended complaint.

2. The court finds that the statute of limitations bars any breach of the implied warranty of merchantability claim stemming from the delivery of poults that occurred prior to August 20, 1988.

3. The court finds the plaintiffs are limited in their recovery on the breach of the implied warranty of merchantability claims to recovery of the purchase price of the poults.

4. The court finds the four year statute of limitations found in the Sherman Act, 15 U.S.C. § 15b, should apply to the claims brought pursuant to § 209 of the Packers and Stockyards Act, 7 U.S.C. § 209. Therefore, any claims stemming from violations of the Packers and Stockyards Act which occurred prior to August 20, 1988, are barred.

In all other respects the motion is denied. Defendants may wish to raise certain of the issues again at the trial of this matter.

IT IS SO ORDERED.