Hugh CHALMERS, et al. *v.* TOYOTA MOTOR SALES, USA, INC., et al.

95-891                                                    935 S.W.2d 285

Supreme Court of Arkansas
Opinion delivered December 16, 1996
[Petition for rehearing denied February 10, 1997.*]

---

* H. Oscar Hirby, Sp. J., and Corbin and Brown, JJ., would grant. Glaze and Thornton, JJ., not participating.

*Hargis, Wood, & Lockhart*, by: *David M. Hargis*, for appellants.

*The Rose Law Firm, A Professional Association*, by: *David L. Williams* and *Vinson & Elkins, L.L.P.*, by: *Max Hendrick, III*, for appellee.

ANDREE LAYTON ROAF, Justice. The appellants filed suit against the appellees for breach of contract, breach of implied contractual covenants of good faith and fair dealing, fraud, interference of contract, violation of the Arkansas Unfair Practices Act, and violation of the Arkansas Franchise Practices Act. The trial court granted summary judgment for the appellees, holding that the Unfair Practices Act did not apply to interstate price discrimination and that the remaining claims were barred by the applicable statutes of limitations. On appeal, the appellants argue that the trial court erred in applying the statutes of limitations because fraudulent concealment and the Continuing Tort doctrine served to toll the running of the statutes. The appellants further contend that the trial court erred in finding that the Arkansas Unfair Practices Act did not apply to their claims. We find no error and affirm.

Appellee Toyota Motor Sales, USA, Inc. ("TMS") is the exclusive importer for Toyota vehicles in the continental United States. TMS uses a system of twelve multi-state distribution regions,

and sells imported and domestically produced vehicles to these regional distributors. The vehicles are in turn sold by the twelve distributors to Toyota dealers in their regions.

Appellee Gulf States Toyota ("GST") is a privately owned corporation and is the regional distributor for the states of Texas, Oklahoma, Mississippi, Louisiana, and Arkansas. Only GST and one other regional distributor are not owned by TMS. Appellee Steve Woods is a former GST employee who served as its district sales manager responsible for the state of Arkansas during 1989-1993. Appellee Toyota Motor Distributors ("TMD") is a wholly owned subsidiary of TMS and is the regional distributor for Tennessee and several other states.

The appellants Hugh Chalmers Chevrolet-Cadillac-Toyota, Inc., and its owners, Hugh B. Chalmers, and Hugh B. Chalmers, Jr. ("the Chalmers"), are located in West Memphis, Arkansas, and became a Toyota dealership in 1976 by entering into a Toyota Dealer Agreement with GST.

On February 6, 1987, Hugh Chalmers wrote a letter to the president of GST expressing dissatisfaction with its vehicle distribution policy. Chalmers complained of an inequitable distribution of Toyotas which had increased over the past several years and asserted that TMD and GST were engaged in different marketing strategies. Chalmers complained that Toyota's distribution boundaries resulted in an injustice to his dealership because he could not participate in the programs and promotions advertised by TMD in the Memphis area.

Chalmers later voiced his concerns to TMS. On October 4, 1989, Chalmers wrote a letter to a vice-president of TMS and stated that the Memphis dealerships had an unfair advantage because of a dual pricing policy between the two regions and that this discriminatory practice was causing him to lose both new car sales and personnel. In the ensuing years, Chalmers continued to correspond with TMS and GST regarding the difficulties created by the Arkansas-Tennessee distribution boundary.

The Chalmers filed suit against the appellees on August 27, 1993. They asserted six claims for relief: 1) frustration of contract performance, prevention and breach of contract; 2) fraud, misrepresentation and deceit; 3) interference with contract rights and expectations; 4) destruction of competition through price discrimination;

5) violation of Arkansas franchise law, and 6) punitive damages. The Chalmers allege that the appellees acted conspiratorially and as agents of one another in engaging in the unlawful actions. They allege that TMS allowed GST and Woods to force dealers within GST's region to accept vehicles loaded with option and accessory packages not required of the Memphis dealers, and that the resulting pricing disparity destroyed their ability to compete in their economic market. The complaint further asserted that the conspiracy and pricing disparity had begun at an earlier, unknown time but that "the effects were not perceived by the Chalmers until late 1989."

The appellees moved for partial summary judgment on the alleged violations of the Arkansas Unfair Practices Act. The trial court granted this motion, finding that the act did not apply to interstate price discrimination. Chalmers then filed an amended complaint which alleged additional violations of the Arkansas Franchise Practices Act. The appellees again moved for summary judgment, raising multiple defenses. The trial court granted the motions and dismissed all claims against the appellees, finding that the applicable statutes of limitations barred the remaining claims. The Chalmers appeal the granting of the summary judgments.

## 1. Statute of limitations.

The Chalmers first argue that the trial court erred in its application of the statutory limitations periods as a bar to their claims. This court has said that the standard for review of a grant of summary judgment is whether the evidentiary items presented by the moving party in support of the motion left a question of material fact unanswered and, if not, whether the moving party is entitled to judgment as a matter of law. *National Bank of Commerce* v. *Quirk*, 323 Ark. 769, 918 S.W.2d 138 (1996). The court views all proof in the light most favorable to the party opposing the motion, resolving all doubts and inferences against the moving party. *Id.* However, once the moving party makes a prima facie showing of entitlement, the responding party must meet proof with proof in order to demonstrate that there is remaining a genuine issue of material fact. *Mount Olive Water Ass'n* v. *City of Fayetteville*, 313 Ark 606, 856 S.W.2d 864 (1993). The response and supporting material must set forth specific facts showing that there is a genuine issue for trial. *Id.*

■ The claims asserted by the Chalmers involve two limitations periods. The statute of limitations for breach of a written contract is five years. Ark. Code Ann. § 16-56-111(b) (Repl. 1995). The remaining claims of the Chalmers are governed by the three-year statute of limitations found at Ark. Code Ann. § 16-56-105(3) (1987). *Hampton* v. *Taylor*, 318 Ark. 771, 887 S.W.2d 535 (1994) (fraud); *Bankston* v. *Davis*, 262 Ark. 635, 559 S.W.2d 714 (1978) (interference with contract); *Winston* v. *Robinson*, 270 Ark. 996, 606 S.W.2d 757 (1980) (liability imposed by statute). The limitations period found in Ark. Code Ann. § 16-56-105(3) begins to run when there is a complete and present cause of action, *Courtney* v. *First Nat'l Bank*, 300 Ark. 498, 780 S.W.2d 536 (1989), and, in the absence of concealment of the wrong, when the injury occurs, not when it is discovered. *Hampton, supra.*

The litigation in the present case was begun on August 27, 1993, therefore the applicable statutes of limitations would act to bar the Chalmers' if they knew or reasonably should have known about their breach-of-contract claim on or before August 27, 1988, and on or before August 27, 1990, with respect to the remaining causes of action.

### A. Fraudulent concealment.

Although the Chalmers had a contractual relationship with GST, on appeal, they do not argue that the five-year statute of limitations applies to their claims against GST or any of the other appellees. In their brief, the Chalmers primarily assert that the statutes of limitations on their claims should have been tolled because of fraudulent concealment (including offers of settlement and cure), and the doctrine of continuing tort. They further present extensive factual information concerning Toyota sales, investigations into Toyota's operations in the United States, devaluation of the dollar against the yen and other matters as bearing on the issue of whether they could have reasonably discovered the alleged wrongful acts before the expiration of the limitations periods.

■ When the running of the statute of limitations is raised as a defense, the defendant has the burden of affirmatively pleading this defense. *First Pyramid Life Ins. Co.* v. *Stoltz*, 311 Ark. 313, 843 S.W.2d 842 (1992), *cert. denied*, 510 U.S. 908 (1993). However, once it is clear from the face of the complaint that the action is barred by the applicable limitations period, the burden shifts to the

plaintiff to prove by a preponderance of the evidence that the statute of limitations was in fact tolled. *Id.*; *Cleveland* v. *Gravel Ridge Sanitary Sewer Imp. Dist. No. 213*, 274 Ark. 330, 625 S.W.2d 446 (1981).

■ Fraud suspends the running of the statute of limitations, and the suspension remains in effect until the party having the cause of action discovers the fraud or should have discovered it by the exercise of reasonable diligence. *First Pyramid* , *supra*. We have stated the following as the "classic language" on this subject:

> No mere ignorance on the part of the plaintiff of his rights, nor the mere silence of one who is under no obligation to speak, will prevent the statute bar. There must be some positive act of fraud, something so furtively planned and secretly executed as to keep the plaintiff's cause of action concealed or perpetrated in a way that it conceals itself. And if the plaintiff, by reasonable diligence, might have detected the fraud he is presumed to have had reasonable knowledge of it.

*First Pyramid* , *supra*. (quoting *Wilson* v. *GECAL*, 311 Ark. 84, 841 S.W.2d 619 (1992)).

■ In discussing when a negligent act occurs to begin the three- year statute of limitations, we have noted that "[a]t times, the beginning of the occurrence is a law question to be determined by the Court. At other times, it is a fact question for the jury to determine." *Orsini* v. *Larry Moyer Trucking, Inc.*, 310 Ark. 179, 833 S.W.2d 366 (1992). Although the question of fraudulent concealment is normally a question of fact that is not suited for summary judgment, when the evidence leaves no room for a reasonable difference of opinion, a trial court may resolve fact issues as a matter of law. *Alexander* v. *Flake*, 322 Ark. 239, 910 S.W.2d 190 (1995) (citing *Miles* v. *A. O. Smith Harvestore Prods., Inc.*, 992 F.2d 813, 817 (8th Cir. 1993)).

■ Moreover, in *Hampton* v. *Taylor*, 318 Ark. 771, 887 S.W.2d 535 (1994), we affirmed the grant of summary judgment where the trial court had found there was no issue of material fact with respect to alleged fraudulent concealment of a cause of action. We stated that mere allegations of fraud, unsupported by evidence, were not enough to create an issue of material fact, and that the allegations of fraud made by the appellant in *Hampton* revealed no "furtive planning" or "secret execution of a fraudulent act," to keep

the appellant's cause of action concealed.

In the present case, it is difficult to determine from the appellants' brief what specific, positive acts of fraud are alleged to have occurred. The Chalmers' complaint asserts that the conspiracy between TMS and GST occurred at various unknown times "and in the years 1987, 1988, 1989." The Chalmers primarily single out the unequal distribution of vehicles to their dealership and various port-installed options programs established by GST as the causes for their inability to compete in their economic market.

Although GST denied that participation in the options program was mandatory, the Chalmers offered considerable evidence that dealers in GST's region were forced to accept vehicles "loaded" with port-installed options and accessories while the Memphis dealers received lower-priced vehicles without the costly options. The Chalmers also presented strong evidence that compensation and incentives plans for GST's district managers heavily influenced the allocation of these loaded vehicles. Nearly $86,000 of Appellee Woods' 1992 salary of $122,690 came from commissions based on the sale to GST's dealers of various port-installed options.

However, the issue to be resolved is when the Chalmers knew or should reasonably have discovered these alleged wrongful acts of the appellees. In the February 1987 letter to GST, appellant Hugh Chalmers, Sr., stated:

> In analyzing our Toyota sales we are struck with the realization that some *major inequities have developed over the past several years,* which have a negative impact on our effectiveness. ... We are disadvantaged because of the *distribution boundary lines* and are being relegated to the status of an outlying rural dealer by Toyota. ... To further compound the problem, not only are we not included, but we are totally ignorant of Toyota's marketing strategy for SMSA Memphis. The Cincinnati region [of TMD] has responsibility for developing Toyota's marketing plans, sales promotions and advertising programs in Memphis, and often Cincinnati is supporting an activity different from that adopted by GST. ... [B]ecause of the sometimes differing marketing programs of GST and [TMD], we find ourselves out of cinque [sic] with what the Toyota buyer has been led to believe is available at this dealership. ... *There is no doubt that this injustice is the result*

> *of Toyota's distribution boundaries,* but it would seem that Toyota would want to correct an obvious inequity, which is having a negative impact on sales. ... If this situation is left uncorrected, ... the problems will amplify.

(Emphasis added.)

In his October 1989 letter to TMS, Chalmers wrote:

> *The disastrous effect incurred by this dual pricing is easily seen* when a comparison is made between our Toyota sales–zip code analysis and the R.L. Polk registrations *over the last five years.* It conclusively shows that the Memphis dealers have an unfair advantage over this dealership in my area of sales responsibility. So long as this discriminatory practice continues I cannot avoid continually losing both new car sales and qualified personnel, thereby having my Toyota franchise undermined.

(Emphasis added.)

These letters clearly show that the alleged wrong occurred at least six years prior to the filing of the complaint in 1993. The letters also demonstrate that the Chalmers knew or through reasonable diligence could have discovered the alleged fraud. Furthermore, Hugh Chalmers, Jr., testified in his deposition taken August 1993, that he was getting accessories on vehicles that he did not want in 1985, and that he had requested of his GST representative that the accessories not be put on. He further stated that he had been forced to take automobiles he didn't want for the past ten years.

■ Although Chalmers did not complain of "dual pricing" until the 1989 letter, and asserted in his deposition that he was not aware of the dual pricing until late 1989, it is clear from the testimony of the Chalmers' expert, Charles Venus, that the allegation of "dual pricing" is a further reference to the port–installed accessories, which the Chalmers had known of since 1985. Dr. Venus testified in his deposition that a price difference between the Chalmers and the Memphis dealerships averaging almost $500 per vehicle existed from at least 1986 onward, and that a substantial part of the differences between what Chalmers and the Memphis dealers paid for cars was the port–installed "CPP" (consumer protection package). Hugh Chalmers also testified that GST port–installed at inflated prices floor mats, spare tires and the CPP in "almost every

car coming into West Memphis." The evidence thus shows that the alleged wrong occurred even prior to 1987 and that the Chalmers knew or through reasonable diligence could have discovered the alleged fraud and their other causes of action as early as 1987.

### B. Promise to cure.

The Chalmers allege that the appellees made promises to cure and offers of settlement which would also serve to toll the statute of limitations. This court has said that an offer of settlement is admissible as relevant to the issue of fraudulent concealment of a cause of action otherwise barred by a statute of limitations. *Lake v. Wright,* 186 Ark. 227, 53 S.W.2d 233 (1932). In *Lake,* the appellant offered to pay the appellee a specific sum to settle a claim involving partnership earnings from 1922, but demanded a receipt for full payment of all claims and refused to allow the words "for the year 1922" to be placed on the receipt. The appellee was unaware that he also had a claim against the appellant's earnings in 1923 and 1924.

However, the evidence submitted by the Chalmers does not demonstrate such conduct by the appellees. TMS wrote Chalmers in October 1989 in response to his letter and denied that the price differences were the result of an unfair pricing policy and stated that it could not undertake an investigation as requested in his letter. Chalmers further testified in his deposition that he met with GST representatives in May 1991, in an effort to resolve his problems and that GST's response was that they would "let the judge handle it." Although Chalmers also testified that GST representatives told him in 1990 and 1991 that they would "support" the transfer of his dealership and "do what it took to get him moved" to the TMD region, these statements fall short of a promise to cure or an offer of settlement which would toll the statute of limitations.

### C. Continuing tort.

In the alternative, the Chalmers assert that the statutes of limitations should have been tolled on a theory of continuous tort. They further allege that the appellees' actions, at some time unknown in the past and up to the time of the litigation, constituted an ongoing civil conspiracy. In Arkansas, civil conspiracy has been defined as a combination of two or more persons to accomplish a purpose that is unlawful, or oppressive, or to accomplish some purpose, not in itself unlawful, by unlawful, oppressive, or

immoral means. *Williams* v. *Hency*, 254 Ark. 685, 495 S.W.2d 875 (1973).

■ Although the appellees assert that civil conspiracy was not plead at the trial court level, the Chalmers' complaint contains a number of allegations that the appellees engaged in a conspiracy. Nevertheless, the continuing-tort theory is not recognized in Arkansas. This court has adopted a "continuous treatment" theory in medical malpractice cases, where the cause of action does not accrue until ongoing treatment ends. *Lane* v. *Lane*, 295 Ark. 671, 752 S.W.2d 25 (1988). However, we have specifically rejected the continuing-tort theory of tolling the statute of limitations as inconsistent with the General Assembly's intent in stating that limitations begin to run at "the date of the wrongful act complained of and no other time." *Tullock* v. *Eck*, 311 Ark. 564, 845 S.W.2d 517 (1993). *See also Taylor* v. *Phillips*, 304 Ark. 285, 801 S.W.2d 303 (1990). As the evidence clearly shows, the wrongful acts which the Chalmers complain of began in the early to mid 1980s.

### 2. *Unfair Practices Act.*

The Chalmers also argue that the trial court erred in dismissing their claims of price discrimination under the Arkansas Unfair Practices Act.

The Arkansas Unfair Practices Act, codified at Ark. Code Ann. § 4-75-201, *et seq.* (Repl. 1996), provides in part that:

> [i]t shall be unlawful for any. . . corporation doing business in the State of Arkansas and engaged in the production, manufacture, distribution, or sale of any commodity or product . . . with the intent to destroy the competition of any regular established dealer in the commodity, product . . . to discriminate between different sections, communities, or cities or portions thereof, or between different locations in the sections, communities, cities or portions thereof *in this state*, by selling or furnishing the commodity, product. . . at a lower rate in one section, community, or city . . . than in another. . . .

Ark. Code Ann. § 4-75-207(a) (Repl. 1996) (emphasis added).

■ Here, the alleged dual-pricing scheme involved TMD sales of vehicles to dealerships in Tennessee. The Arkansas Unfair Practices Act, by its very terms, applies to price discrimination

between one area in Arkansas and another area in Arkansas. As a general rule, statutes have no effect except within the state's own territorial limits. *Widmer v. Wood*, 243 Ark. 457, 420 S.W.2d 828 (1967). The Chalmers do not allege that there was any dual pricing within Arkansas.

The Chalmers argue for an extraterritorial application of the Arkansas Unfair Practices Act, under Ark. Code Ann. § 4-75-207(b) (Repl. 1996), which provides:

> The inhibition of this section against locality discrimination shall include any scheme of. . . collateral contracts, or any device of any nature whereby such discrimination is, in substance or fact, effected in violation of the spirit and intent of this subchapter.

However, we have not heretofore held that the Unfair Practices Act is to be given application beyond the borders of Arkansas. Moreover, the statute is penal in nature and must be strictly construed in favor of those upon whom the burden of the penalty is sought to be imposed. *Wal-Mart Stores, Inc. v. American Drugs, Inc.*, 319 Ark. 214, 891 S.W.2d 30 (1995). We cannot say that the trial court erred in granting summary judgment to appellees on this claim.

### 3. Trial-practice issues.

The Chalmers finally argue that the trial court erred in its dismissal of the appellants' claims subject to no bar of any statute of limitations. In this point, the Chalmers state that "this space was intended to bring certain trial-practice issues before this Court," had space permitted. They present no legal arguments or authority, but merely cite as an example certain objections and conduct by appellees' counsel during the taking of a deposition. Failure to argue a point on appeal constitutes a waiver. *Hazen v. City of Boonville*, 260 Ark. 871, 545 S.W.2d 614 (1977); *Brockwell v. State*, 260 Ark. 807, 545 S.W.2d 60 (1976).

Affirmed.

Special Justice Henry Kinslow joins in this opinion.

Corbin, Brown, J.J., and Special Chief Justice B.W. Sanders, dissenting.

JESSON, C.J., AND GLAZE, J., not participating.

ROBERT L. BROWN, Justice, dissenting. This is a complex matter involving the Chalmers Toyota dealership in West Memphis and the parent company for Toyota as well as the regional Toyota distributors. The majority affirms summary judgment against Chalmers, and in favor of the Toyota corporations, on the ground that Chalmers's complaint filed on August 27, 1993, was too late and violated the three-year limitations period for torts. I disagree because I believe a fact question has been created by Toyota's actions.

Chalmers's contention is that Toyota has discriminated against his dealerships in West Memphis compared with the Toyota dealerships in Memphis. This discrimination took the form of price disparities for vehicles shipped into the Memphis and West Memphis markets, with higher prices for the same vehicles assessed to Chalmers's West Memphis dealership. It also took the form of vehicles loaded with accessories being made available to Chalmers which resulted in higher prices to him as compared to his Memphis counterparts. The problem arises, according to Chalmers, because West Memphis and Memphis are in different distribution regions for Toyota: West Memphis is in Gulf States Toyota region (GST) and Memphis is in Toyota Motor Distributors region (TMD).

According to the record before us. Chalmers complained bitterly about this disparate treatment but, according to Chalmers, GST gave him assurances that the matter would be rectified. In 1990 and 1991 those efforts to cure the situation centered around Chalmers being placed in the TMD region with the Memphis dealerships. That would have eliminated the disparity in treatment between the dealerships in West Memphis and Memphis. According to Chalmers, GST was amenable to the idea and misled him into believing that this solution was viable.

The chronology on this point is important:
*October 4, 1989:*

> Chalmers wrote the parent company, Toyota Motor Sales, that the price of cars to him was more than the Memphis dealerships. He said he did not know how long the price discrimination had existed but that it should be investigated.

*October 16, 1989:*

> Toyota Motor Sales wrote Chalmers that there were no

discriminatory pricing practices and that the Gulf States Toyota president would work with him to create a situation where its dealers were competitive.

*December 1, 1989:*

Chalmers wrote Toyota Motor Sales and contested the division of one metropolitan area (Memphis and West Memphis) into two operating distributorships with separate pricing policies.

*January 22, 1990:*

Chalmers met with Gulf States Toyota representatives to discuss, among other things, his joining the TMD region with the Memphis dealerships. GST, according to Chalmers, committed to solving his problem.

*March 12, 1990:*

Chalmers wrote to Gulf States Toyota that his sales deficiencies were due to the discriminatory pricing between the West Memphis and Memphis markets.

*July 1, 1992:*

Chalmers wrote Jerry Pyle, Gulf States Toyota's president, that GST had disregarded its commitment to rectify his situation. One solution had been his transfer into the same distribution region as Memphis. He wrote that though GST had committed to correcting his problem in January 1990, when he contacted Toyota Motor Sales in December 1990, the company was unaware of this commitment.

*July 15, 1992:*

Jerry Pyle, president of Gulf States Toyota, wrote Chalmers that Gulf States Toyota was not discriminating with its pricing and that a market study had been conducted of the West Memphis market which "irrefutably demonstrated" that West Memphis should not be part of the Memphis distribution area. Pyle wrote: "TMS and GST consider this issue closed . . . ."

Pyle added that GST stood ready to assist him in his sales performance but then stated: "If, for any reason, you choose not to work toward the solution that I have sug-

gested, there are other forums (both administrative and legal) where you can properly address your grievances."

Chalmers's argument contemplates that Toyota cajoled, manipulated, and ultimately misled him into believing the situation would be cured by placing him in the TMD region with the Memphis dealerships. This occurred until July 15, 1992. That constitutes enough positive action in my judgment under *First Pyramid Life Ins. Co.* v. *Stoltz*, 311 Ark. 313, 843 S.W.2d 842 (1992), *cert. denied*, 510 U.S. 908 (1993), to raise a fact question concerning a concealment of Toyota's true intentions. Certainly, Chalmers relied on Toyota's promise to study his unique marketing region. A market study was done, but Chalmers was not told that the issue was closed until Jerry Pyle's letter in 1992. With that letter, negotiations broke down, and Toyota referred Chalmers to the courts.

We are not required at this juncture to determine whether substantial evidence supports Chalmers's claim of concealment but only to decide whether a material issue of fact exists. Ark. R. Civ. P. 56. I conclude that one does. I would remand this matter so that Chalmers can further develop his case.

CORBIN, J., joins.

SANDERS, B.W., Special Associate Justice, joins.