MERCANTILE BANK, n/k/a Union Planters Bank of
Northeast Arkansas *v.* B & H ASSOCIATED, INC., Fred
Boling and Clara Boling

97-280                                        954 S.W.2d 226

Supreme Court of Arkansas
Opinion delivered October 23, 1997

*Snellgrove, Laser, Langley , Lovett, & Culpepper,* by: *Todd Williams,* for appellant.

*Larry Boling,* for appellees.

TOM GLAZE, Justice. Appellee B & H Associates and Fred and Clara Boling[1] owned what is called the Uni-Banc System — a complete in-house processing system designed in 1979 to handle the accounting needs of banks. In February of 1992, B & H sold a copy of the Uni-Banc System software program to Sparak Financial Systems, Inc., and it is the 1992 sales contract that, in part, plays a role in the litigation now before us involving Mercantile Bank and B & H Associates.[2] Under the 1992 contract, Sparak acquired broad authority to market, license, develop, and use the Uni-Bank System. Sparak could use the copy as if it were the original software program, and was not required to pay B & H any royalties or licensing fees. The parties' contract provided that Sparak's and B & H's interests in the system were exclusive except as to each other's interest, and that neither Sparak nor B & H could transfer, sell, assign, or encumber the system without the prior consent of the other. Moreover, each party had the right of first refusal on any sale or any proposed sale of the system by the other, and in the event B & H sold its interest, B & H was required to pay Sparak $60,000.00 from the sale proceeds. Signifi-

---

[1] Hereinafter, for writing purposes, appellees collectively are often referred to as B & H and B & H Associates.

[2] Mercantile Bank is now Union Planters Bank of Northeast Arkansas.

cant to this present suit between Mercantile Bank and B & H, the 1992 Sparak contract provided that, in the event either B & H or Sparak went into bankruptcy or had a judgment entered against it in excess of $50,000.00, the obligated party would sell its interest in the Uni-Banc system to the other for the sum of $25,000.00.

The present dispute between Mercantile Bank and B & H arose from a September 22, 1993 loan that the Bank made to B & H and the Bolings in the sum of $150,000.00. The parties' promissory note evidencing the loan was secured by B & H's Uni-Banc System. When B & H defaulted, the Bank sued, and subsequently took possession of B & H's computer software identified as the Uni-Banc System. Afterwards, Mercantile Bank, at a private sale, sold the copy of the system to Sparak for $25,000.00 and the Bank then sought a deficiency judgment against B & H and the Bolings. However, B & H and the Bolings defended the Bank's action, claiming Mercantile Bank's sale of the Uni-Banc System's software had not been conducted in a commercially reasonable manner. After a jury trial, B & H and the Bolings were favored with a defendants' verdict, and when the trial court denied the Bank's motion for a new trial or judgment notwithstanding the verdict, the Bank brought this appeal.

Mercantile Bank first contends the trial court erred in denying its new-trial motion because there was no evidence from which reasonable minds could conclude that its sale of the Uni-Banc System to Sparak was not conducted in a commercially reasonable manner. The Bank's contention is largely based upon Mr. Boling's earlier inability to obtain a purchaser for the Uni-Banc System. It submits the $150,000.00 loan was made essentially to give Mr. Boling an opportunity to sell the system's software to pay off B & H's indebtedness. Although Mr. Boling had made a number of contacts seeking buyers for the system, the Bank's Vice-President, Brad Edwards, said Boling had been unable to obtain a purchaser. Edwards claimed the Bank had used Mr. Boling's contacts, but the Bank, too, failed to find a buyer. Bank officer Edwards related the Bank further used the assistance of Tim Gibson, the president of a local computer system business, and Gibson, among other things, opined Sparak's purchase price of $25,000.00 was "quite a bit." Another witness, James V. Burnett,

had a current interest in Uni-Bank System which permitted him to re-market the system to banks. The Bank points out that, when Burnett was asked if he would be interested in buying a copy of the system's software, he responded no because Sparak's 1992 contract presented "too many strings" attached to any sale.

■ Mercantile Bank emphasizes the foregoing evidence to support its argument that it had conducted a commercially reasonable sale when obtaining $25,000.00 from Sparak for B & H's Uni-Banc System. However, this court's review of the trial court's denial of the Bank's new-trial motion is whether there is any substantial evidence to support the jury's verdict. *Fisher v. Valco Farms*, 328 Ark. 741, 945 S.W.2d 369 (1997). In examining whether substantial evidence exists, all evidence must be examined in the light most favorable to the party on whose behalf the judgment was entered and given its highest probative value, taking into consideration all reasonable inferences deducible from it. *Esry v. Cordin*, 328 Ark. 153, 942 S.W.2d 846 (1977). In such situations, the weight and value [of testimony] is a matter within the exclusive province of the jury. *Id.*

■ ■ Before reviewing the evidence in B & H's favor to determine if the verdict should stand, we first discuss the law relevant to a creditor's right to dispose of collateral securing an indebtedness. In this respect, a secured party after default may sell, lease, or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing, Ark. Code Ann. § 4-9-504(1) (Repl. 1991), and the disposition of the collateral may be by public or private proceedings . . ., but every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable. Ark. Code Ann. § 4-9-504(3) (Repl. 1991). While a creditor is given the right to a deficiency judgment under Ark. Code Ann. § 4-9-504(2) (Repl. 1991), the creditor's right to such judgment depends on whether he has complied with the statutory requirements concerning disposition and notice. *First State Bank of Morrilton v. Hallett*, 291 Ark. 37, 722 S.W.2d 555 (1987). When the debtor defends upon the ground that the secured creditor did not proceed in accordance with the provisions of the Uniform Commercial Code, the creditor has the burden of proving that he pro-

ceeded in a commercially reasonable manner. *Farmers Equipment Co. v. Miller*, 252 Ark. 1092, 482 S.W.2d 805 (1972); *Henry v. Trickey*, 9 Ark. App. 47, 653 S.W.2d 138 (1983). Courts have held, and we agree, that whether a sale of collateral was conducted in a commercially reasonable manner is essentially a factual question. *United States v. Conrad Publishing Co.*, 589 F.2d 949 (8th Cir. 1978); *Cheshire v. Walt Bennett Ford, Inc.*, 31 Ark. App. 90, 788 S.W.2d 490 (1990); *Henry*, 9 Ark.App. 47, 653 S.W.2d 138. And, if a secured party sells the collateral in a commercially unreasonable manner, a presumption arises that the value of the collateral is equal to the outstanding debt; however, the secured party can still recover a deficiency upon proving that the reasonable value of the collateral was less than the debt. *Barker v. Horn*, 245 Ark. 315, 432 S.W.2d 21 (1968); *Henry*, 9 Ark. App. 47, 653 S.W.2d 138; and J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE (2d ed. 1980). Finally, when determining whether the sale of a collateral was handled in a commercially reasonable manner, this court has held that a major consideration is the determination of the fair market value of the collateral. *Thrower v. Union Lincoln-Mercury, Inc.*, 282 Ark. 585, 670 S.W.2d 430 (1984).

After a careful review of the record, we conclude that Mercantile Bank failed to overcome its legal burdens as set out above and that there is substantial evidence to support the jury's decision that the Bank's sale to Sparak was not commercially reasonable. We now allude to that evidence that favors B & H's verdict.

■ While Mr. Edwards testified that he had incurred in excess of 100 hours in trying to find potential buyers for the Uni-Banc System, he conceded that, other than a company he had located named Advance Data, the Bank essentially limited its contact to eight persons or entities given it by Mr. Boling. The Bank admitted that it did not advertise in magazines, *American Bankers' Journal*, state bank journals, banking computer trade magazines, or newspapers. Yet, a banker and financial consultant, Johnny Ray McFarland, testified that, in locating potential buyers for Uni-Banc, he would not have limited his contacts to Mr. Boling's prospects and would have advertised in the most accessible market and utilized trade publications sent to bankers. We point out, as well,

that sales have been held not to have been commercially reasonable where there was minimal advertising of the sale and where there was a great disparity between the sale price and the fair market price. *United States v. Conrad Publishing Co.*, 589 F.2d 949 (8th Cir. 1978).

Edwards also admitted Mercantile Bank had a duty to obtain a fair market value when selling the system, but the Bank obtained no such value. The Bank's witness, Tim Gibson, who sells licenses for computer software systems, stated that he was unable to place a value on the Uni-Banc System. In his opinion, Gibson said "there was no way to determine whether the system was worth $25,000.00, $1,000.00, $500,000.00, or $1,000,000.00." In sum, there is substantial evidence in the record that reflects the Bank made no reasonable effort to determine the fair market value or identify potential buyers.

On the other hand, the Bank was well aware that Sparak had purchased its interest in the Uni-Banc System for $805,000.00, and knew James V. Burnett had purchased an interest in the Uni-Banc System in 1993, and his contract had resulted in payments to B & H in the approximate annual amount of $25,000.00 in royalties. Concerning Sparak's purchase, Mr. Boling testified that Sparak had licensed the Uni-Banc software to eighty banks and had earned $1.5 million on its $805,000.00 investment.

■ Because the foregoing reflects substantial evidence to support the jury's decision that the Bank's sale to Sparak was not commercially reasonable, we conclude the trial court did not abuse its discretion in denying the Bank's request for a new trial.

In its second point for reversal, Mercantile Bank argues value testimony given over its objection at trial had prejudiced its case and caused reversible error. It first challenges Mr. Boling's trial testimony concerning an offer that he had received in August 1994 from Oracle Corporation to buy B & H's Uni-Banc System. The Bank objected on hearsay grounds. The trial court ruled Mr. Boling could discuss the sale of the property to the people (Oracle), but he could not mention the amount offered. When Boling resumed testifying, he was asked the purpose of Oracle's contacting him, and he responded that Oracle wanted to make an offer.

Boling then volunteered, "I asked [Mr. Smith] to contact Mercantile Bank and also give Mercantile Bank the information about the price that he was asking which was in excess of $400,000.00." The Bank's counsel approached the bench, renewed his objection, and requested a mistrial. The trial judge rejoined that a mistrial was too drastic, but he would (and did) instruct the jury to disregard the amount mentioned by Mr. Boling because it was hearsay.

The rule is well settled that a mistrial is an extreme remedy to be taken only when it is apparent that justice cannot be served by continuing the trial. *Bull Shoals Community Hosp. v. Partee*, 310 Ark. 98, 832 S.W.2d 829 (1992). It is proper only when the error is beyond repair and cannot be corrected by any curative relief. *Nobles v. Casebier*, 327 Ark. 440, 938 S.W.2d 849 (1997). The granting of a mistrial is within the sound discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal absent a showing of abuse.

As discussed in detail above, considerable evidence was presented, bearing on Uni-Banc System's worth or value, and some of that testimony offered figures well in excess of the $400,000.00 offer which Boling mentioned at trial. Considering the circumstances, we simply are unable to say the trial court's cautionary instruction to the jury did not cure any prejudice caused by Boling's offer statement.

The Bank also questions the trial court's allowing Johnny Ray McFarland to testify as an expert and specifically permitting him to give value testimony concerning Uni-Banc System's software. First, in reviewing the abstract of record, we do not find a definitive ruling on accepting or rejecting McFarland as an expert. However, the Bank did question whether B & H had established a proper foundation upon which McFarland could offer an opinion in putting a market value on the Uni-Banc System's software. We believe such foundation was sufficient.

McFarland explained his long-standing experience with B & H's software. He had been a Senior Vice President with the Bank of Wynne, and in that capacity, he became intimately familiar with the Uni-Banc System. During his thirteen years with the Bank of Wynne, he worked with the system. He testified in detail

how the system worked, compared it as being superior to others, and related that the Wynne Bank had paid B & H $25,000.00 just for the right to use B & H's software. While McFarland admitted he had no college course or education with respect to placing a market value on software, he said that he had been involved in the purchase or sale of source codes for software. He said that his company, Alpha Financial Services, evaluated properties and businesses, and he mentioned the three appraisal approaches he utilized when establishing a market value.

After giving the foregoing testimony, McFarland was asked if he had an opinion concerning the Uni-Banc System, to which Mercantile Bank objected. And while McFarland started to mention an offer he knew had been given to Mr. Boling, the trial court interrupted, by instructing McFarland his opinion could not be based on what somebody else told him. McFarland then stated without objection he valued the system at $1.2 million. Later, when the Bank and the trial court questioned McFarland's basis for arriving at his value testimony, he assured them his opinion was not based on someone else's opinion as to the software's worth, but instead he reached his opinion by employing the hours that went into developing the B & H software and using the knowledge that, in 1992, Sparak had paid more than $800,000.00 for a copy of the software.

This court has long recognized that the admissibility of expert testimony rests largely within the broad discretion of the trial court, and the appellant bears the burdensome task of demonstrating the trial court abused its discretion. *Collins v. Hinton*, 327 Ark. 159, 937 S.W.2d 164 (1997). Generally, the tendency is to permit the jury to hear the testimony of the person having superior knowledge in a given field unless clearly lacking in either training or experience, and too rigid a standard should be avoided. *Mine Creek Contractors, Inc. v. Grandstaff*, 300 Ark. 516, 780 S.W.2d 543 (1989). If some reasonable basis from which it can be said the witness has knowledge of the subject beyond that of persons of ordinary knowledge, his evidence is admissible. *Id.*

Here, given McFarland's background and his intimate knowledge of the Uni-Banc System, there was more than a suffi-

cient basis to uphold the trial court's ruling allowing his value testimony.

Affirmed.