MILLER BREWING COMPANY *v.*
ED ROLESON, JR., INC.

04-1163                                              223 S.W.3d 806

Supreme Court of Arkansas
Opinion delivered January 19, 2006

[Rehearing denied February 23, 2006.*]

---

* GLAZE, J., would grant rehearing as to point two. CORBIN, J., not participating.

*Williams & Anderson PLC*, by: *Peter G. Kumpe* and *Kelly S. Terry*; *Rieves, Rubens & Mayton*, by: *Kent J. Rubens*; and *King & Spalding LLP*, by: *Michael W. Youtt, pro hac vice*, for appellant.

*Tony L. Wilcox, P.A.*, and *Orr, Scholtens, Wilhite & Averitt, PLC*, by: *Chris A. Averitt* and *Jay Scholtens*, for appellee.

JIM GUNTER, Justice. Appellant, Miller Brewing Company ("Miller"), appeals a judgment entered by the Crittenden County Circuit Court on a jury's verdict, awarding Ed Roleson, Jr., Inc. ("Roleson") $1,600,000.00 in damages for breach of contract, violation of the Arkansas Franchise Practices Act, and civil conspiracy. We affirm the judgment of the circuit court.

Since 1943, Roleson has been, and continues to be, a wholesale beer distributor for Miller. Mike Roleson is the president of Roleson, which is located in Paragould. Under the Distributor Agreement between Roleson and Miller, Miller "agree[d] to sell and [Roleson] agree[d] to buy and market" specifically designated brands of beer in Greene, Poinsett, and Mississippi Counties.

In 1996, Miller developed an internal consolidation plan known as the "White Paper" in which Miller determined that it needed to reduce the number of wholesale distributors in Arkansas for optimum financial performance.[1] In this plan, Miller concluded that Roleson would sell its business to White River Beverage Company, Inc. ("White River"), a Coors and Miller distributor located in Newport and owned by George O'Conner. This internal memo was not made known to Mr. Roleson. In 1999, Mr. O'Conner made an offer to purchase Roleson, which Mr. Roleson rejected. At trial, Mr. Roleson presented evidence that in order to remain economically viable in the current beer-distribution market, a distributor must maintain a market share of at least 25% to 30%; at the time of trial, Roleson's market share was about 24%. A Miller representative also testified at trial that, in order to maintain profitability in the current market, Roleson must grow its business. Otherwise, he thought that Roleson should exit the market.

In an effort to increase its market share in 2001, Roleson attempted to purchase Charles Campbell Distributing Company-("Campbell") in Blytheville. Campbell serviced the same territory serviced by Roleson. Campbell's primary business was distributing Coors products, but it had distribution rights for four brands of beer for which Miller had acquired the rights in 1999. These four brands (the "Acquired Brands") — Hamm's, Henry Weinhard's, Mickey's, and Old English — made up about 4% of Campbell's

---

[1] We note that under Ark. Code Ann. § 3-5-1108 (Repl. 1996), a beer supplier may not terminate a distributor agreement without payment of reasonable compensation to the distributor.

business. While it is clear that Campbell and Roleson never entered into a signed contract, it is not clear exactly how close they came to that goal. There is no dispute that the parties were in negotiations. Campbell sent a letter to Roleson's accountant dated January 29, 2001, stating that he could not provide certain sales data, in case the sale did not go through, and stating that he would take "six dollars per case for the year 2000 sales." In April of 2001, Roleson delivered to Campbell an unsigned contract whose terms appear slightly different from those mentioned in Campbell's letter and an earnest-money check.

In the meantime, Mr. Roleson met with a Miller representative, Jim Young, on February 12, 2001. During that meeting, Mr. Roleson told Mr. Young that he was in negotiations to buy Campbell's business. Mr. Young allegedly told Mr. Roleson that Roleson would get Campbell's Acquired Brands, and that he would help Roleson become an approved Coors distributor as well. Mr. Roleson and Roleson's general manager, Larry Holcomb, both testified that Mr. Young asked them to give him ten days to meet with his counterpart at Coors to help arrange the transfer. The day after his meeting with Mr. Roleson, Mr. Young met with George O'Conner, the owner of White River. Mr. Roleson alleged, and Mr. O'Conner denied, that Mr. Young informed Mr. O'Conner about Roleson's negotiations with Campbell and instructed Mr. O'Conner to purchase Campbell. In any event, Mr. O'Conner and Mr. Campbell met on February 19, 2001, and entered into an oral agreement for White River to purchase Campbell. This oral agreement was later documented, and White River purchased Campbell. Mr. O'Conner admitted that the February 19, 2001, meeting was the first time he had spoken with Mr. Campbell about buying his business, and testified that it was his president Jan Bratcher's idea to purchase Campbell. However, Mr. Bratcher testified that he did not think it was a good idea to purchase Campbell, that he did not know where Mr. O'Conner got the idea to purchase Campbell, and that he set up the February meeting several days before February 19th at Mr. O'Conner's request.

Mr. Roleson testified that Mr. O'Conner called him on February 27, 2001, and offered to purchase Roleson. When Mr. Roleson rejected his offer, Mr. O'Conner stated that he was in a "moral dilemma" because he was going to buy Campbell. Both Mr. O'Conner and Mr. Roleson testified that Mr. Young informally authorized White River's purchase of Campbell, but they

differ as to whether this "authorization" was a request by Mr. Young or merely permission and whether it occurred before or after the February 19th meeting. Mr. O'Conner also told Mr. Roleson that he needed to sell to Mr. O'Conner before "he had a heart attack fighting Miller."

Finally, Mr. Roleson presented testimony that he attempted to acquire a Miller distributorship in Mountain Home in March of 1999, but was prevented from doing so by Miller. Miller would not approve any Arkansas purchasers, and the Mountain Home distributorship was sold to a Missouri distributor.

Roleson filed a lawsuit against Miller, White River, and George O'Conner.[2] By the time the case was tried to the jury, the following claims remained against Miller: breach of contract, violation of the Arkansas Franchise Practices Act, tortious interference with business expectancy, and civil conspiracy. At the close of Roleson's case, Miller moved for a directed verdict on each of the claims, which was denied by the circuit court. The jury returned a verdict in Miller's favor on the tortious-interference claim, but found for Roleson on the breach-of-contract claim, the violation of Franchise Act claim, and the civil-conspiracy claim. In response to interrogatories, the jury awarded $1,600,000.00 in damages on each of the three counts to Roleson. The circuit court then entered a judgment, awarding Roleson a total of $1,600,000.00 in damages. The circuit court denied Miller's subsequent motions for judgment notwithstanding the verdict and, alternatively, for a new trial. Miller appeals all three adverse verdicts; Roleson conditionally cross-appeals the tortious-interference verdict, conditioned on our reversing all three verdicts in its favor.

We review the trial court's denial of a motion for directed verdict, denial of motion for judgment notwithstanding the verdict, and denial of new-trial motion for whether there is substantial evidence to support the jury's verdict. *State Auto Prop. & Cas. Ins. Co. v. Swaim*, 338 Ark. 49, 991 S.W.2d 555 (1999); *Mercantile Bank v. B & H Assoc., Inc.*, 330 Ark. 315, 954 S.W.2d 226 (1997). Substantial evidence is defined as evidence of sufficient force and character to compel a conclusion one way or the other with

---

[2] Roleson filed a motion for voluntary nonsuit of Mr. O'Conner, which was granted by the circuit court. The circuit court also granted White River's motion for summary judgment, dismissing it from the lawsuit.

reasonable certainty; it must force the mind to pass beyond mere suspicion or conjecture. *Swaim, supra.* When making this determination, we examine the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.* Using this standard, we consider Miller's points on appeal.

### I. Violation of Franchise Practices Act

We first consider Miller's point on appeal involving the jury's finding that Miller violated the Arkansas Franchise Practices Act ("Franchise Act" or "Act").[3] Miller asserts that the trial court erred in submitting this claim to the jury for two reasons: (1) Roleson had no express or implied right under the Franchise Act or the franchise agreement to acquire additional brands or territories; and (2) Roleson's claim under the Franchise Act is preempted by the Arkansas Beer Wholesaler Statute, specifically, Ark. Code Ann. § 3-5-1108(a) (Repl. 1996).

The statutory provision of the Franchise Act at issue is set forth in Ark. Code Ann. § 4-72-206 (Repl. 2001), which states in relevant part as follows:

> It shall be a violation of this subchapter for any franchisor, through any officer, agent, or employee to engage directly or indirectly in any of the following practices:
>
> . . .
>
> (6) To refuse to deal with a franchise in a commercially reasonable manner and in good faith[.]

Ark. Code Ann. § 4-72-206 (Repl. 2001). "Franchise" is defined by the Act as

> a written or oral agreement for a definite or indefinite period in which a person grants to another person a license to use a trade name, trademark, service mark, or related characteristic within an exclusive or nonexclusive territory or to sell or distribute goods or services within an exclusive or nonexclusive territory at wholesale or retail, by lease agreement, or otherwise.

---

[3] Ark. Code Ann. §§ 4-72-201 to 210 (Repl. 2001).

Ark. Code Ann. § 4-72-202(1)(A) (Repl. 2001). "Good faith" means "honesty in fact in the conduct or transaction concerned." Ark. Code Ann. § 4-72-202(8) (Repl. 2001). The Franchise Act does not define "commercially reasonable manner."

Whether Miller dealt with the franchise in a commercially reasonable manner and in good faith is a fact question for the jury. *See Mercantile Bank v. B & H Associated, Inc.*, 330 Ark. 315, 320, 954 S.W.2d 226, 229 (1997). The question before us is whether, examining the evidence and all reasonable inferences arising therefrom in the light most favorable to Roleson, there was substantial evidence to support the jury's verdict that Miller did not deal with the franchise in a commercially reasonable manner and in good faith. *Id.* We hold that there was substantial evidence to support the jury's finding that Miller refused to deal with its franchise with Roleson in a commercially reasonable manner and in good faith.

Miller argues that there was no evidence to support this claim because the claim is not based on Roleson's rights under his existing contract with Miller, but on rights Roleson might have to enter into a future contract to purchase Campbell's business. Relying on the definition of franchise as "a written or oral agreement," Miller argues that, because the Distributor Agreement between Miller and Roleson conferred no rights upon Roleson to enter into new contracts for other franchises covering other brands, there was no "franchise" with regard to these other brands. Miller claims that, because Roleson had no franchise agreement with Miller with respect to Roleson's ownership of other brands and territories not specifically listed in the Distributor Agreement, Roleson could not make a claim of a violation of the Franchise Act with regard to such brands. We disagree.

Roleson is not claiming that Miller violated some non-existent franchise agreement between Miller and Roleson regarding other brands, but that Miller refused to deal with the existing franchise between Miller and Roleson in a commercially reasonable manner and in good faith. According to Roleson, Miller adopted and executed a plan to eliminate Roleson as a distributor and applied pressure to other distributors — including Campbell, White River, and Mountain Home — in furtherance of that plan. While Miller's actions may not have caused Roleson to lose the brands and territories listed in the existing Distributor Agreement, Roleson claims that Miller's actions prevented it from growing its business and increasing its revenues, which was critical to its ability to remain competitive in the changing beer market.

While we have not had an opportunity to interpret this provision of the Franchise Act, an opinion by the Eighth Circuit Court of Appeals offers some guidance. In *Southern Implement, Inc. v. Deere & Co.*, 122 F.3d 503 (8th Cir. 1997), a franchisee of John Deere equipment sued its franchisor, alleging that the franchisor permitted an unauthorized dealer to sell within the franchisee's assigned territory. Because the contract did not give the franchisee an exclusive right to sell Deere products in its "area of responsibility [AOR]" and because the contract did not require the franchisor to police a franchisee's AOR or prevent other dealers from establishing facilities in the AOR, the trial court granted summary judgment in favor of the franchisor on the Franchise Act claim. *Id.* The Eighth Circuit reversed, holding that — *in spite of the lack of a specific contractual obligation* — a jury could have found that the franchisor had an obligation to investigate and prevent others from operating an unauthorized facility. The court held that the failure to do so in that case could constitute bad faith. *Id.*

While the Distributor Agreement between Miller and Roleson did not specifically address Roleson's acquisition of additional brands and territories, the law requires the parties to deal with the franchise in a commercially reasonable manner. Ark. Code Ann. § 4-72-202(7) and 206(6). Without enumerating all of a franchisor's acts which might constitute a failure to deal with a franchise in a "commercially reasonable manner," we hold that a franchisor's attempt to force a franchisee out of business may constitute a refusal to deal with a franchise in a commercially reasonable manner and in good faith under Ark. Code Ann. § 4-72-206(6).

We now review whether there is substantial evidence to support the jury's verdict that Miller violated this provision of the Franchise Act. Roleson presented evidence at trial of the White Paper, which set forth Miller's plan to eliminate Roleson as a distributor. Testimony at trial indicated that this plan was not disclosed to Roleson. Larry Holcomb, Roleson's general manager, testified that he and Mr. Roleson found out from a Miller representative at a national sales meeting that Miller had thwarted Roleson's efforts to purchase Campbell in furtherance of that plan. The Miller representative stated that Miller simply "wanted to grow the size of [certain] Miller distributors" and that Roleson was not one of those distributors. The Miller representative said that Roleson was not "in Miller Brewing Company's long term plans." Furthermore, in a courtesy call to Mr. Roleson to let him know

that White River had made a deal to purchase Campbell and to make an offer to purchase Roleson, Mr. O'Conner testified that he told Roleson he should sell before he died of a heart attack fighting Miller. The jury could have inferred from this testimony that Mr. O'Conner knew of Miller's plan to force Roleson out of business.

■ There was also evidence in the testimony of Jim Young, Miller's representative, Jan Bratcher, White River's president, and Ed Roleson from which the jury could have found that the sale of Campbell to White River was executed in furtherance of Miller's overall plan to eliminate Roleson as a distributor. Mr. Bratcher stated that the plan to buy Campbell's business came unexpectedly from Mr. O'Conner, and that he advised Mr. O'Conner that it was a bad deal. Mr. O'Conner's decision to buy Campbell and his subsequent meeting with Mr. Campbell occurred within days of Mr. O'Conner's meeting with Mr. Young. Considering the evidence and all reasonable inferences arising therefrom in the light most favorable to Roleson, as we must under our standard of review, we hold that there was substantial evidence to support the jury's verdict that Miller "refuse[d] to deal with a franchise in a commercially reasonable manner and in good faith" in violation of Ark. Code Ann. § 4-72-206(6).

■ Finally, we reject Miller's argument that Roleson's Franchise Act claim is preempted by the Beer Wholesaler's Act. Miller cites a provision of the Act which requires a supplier, such as Miller, to pay "reasonable compensation" to a wholesaler when the supplier has terminated, amended, or modified their agreement or otherwise interfered with a transfer of the wholesaler's business. Ark. Code Ann. § 3-5-1108(a) (Repl. 1996). It also provides that "nothing contained in this subchapter shall give rise to a claim against the supplier or wholesaler by any *proposed purchaser* of a wholesaler's business." *Id.* (emphasis added). Roleson's claim under the Franchise Act is not a claim against Miller by a proposed purchaser of a wholesaler's business, but by its own franchisee. Roleson's claim is that Miller refused to deal with the franchise in a commercially reasonable manner by attempting to put Roleson out of business. Miller's alleged interference with the potential purchase of Campbell was merely evidence used to support Roleson's claim. Thus, we hold that Roleson's Franchise Act claim is not preempted by Ark. Code Ann. § 3-5-1108(a) (Repl. 1996).

## II. Breach of Contract and Civil Conspiracy

■ The circuit court entered a total judgment amount of $1,600,000.00 upon the jury's verdict stating an amount of $1,600,000.00 in damages for each of the three counts in favor of Roleson. The parties have agreed that if we affirm on any one of the jury's three verdicts, the court's judgment must be affirmed. Because we have affirmed the jury's verdict on the Franchise Act claim, and therefore affirmed the jury's damages award of $1,600,000.00, we need not address Miller's arguments regarding the jury's verdicts on breach of contract or civil conspiracy.

## III. Failure to Prove Damages and Injury

Miller's next point on appeal is that the trial court erred in submitting Roleson's breach-of-contract and violation of Franchise Act claims to the jury because Roleson presented no evidence of damages. The gist of Miller's argument is that Roleson's claims involved Miller's interference with Roleson's "right" to purchase the Acquired Brands from Campbell. Miller contends that, because only 4% of the lost profits proven by Roleson resulted from failure to purchase the Acquired Brands, there were essentially no damages. We reject this argument.

■ With regard to the Franchise Act violation, Roleson's damages were whatever amount the jury determined that Roleson lost as a result of Miller's actions. It is irrelevant that only 4% of Campbell's profits resulted from the sale of Miller brands; the jury was not limited by the lost profits from the purchase of Campbell's Miller brands. The jury could have concluded, and obviously did conclude, that Miller's violation of the Franchise Act prevented Roleson from purchasing all of Campbell's brands.

■ Miller's next point on appeal is that the trial court erred in submitting each of Roleson's claims to the jury because Roleson failed to prove that an injury was caused by the alleged wrongful acts. Miller argues that because Roleson's lost-profit damages were based almost solely upon its failure to acquire Campbell, Roleson must have shown that but for Miller's wrongful conduct, it would have acquired Campbell. Miller argues that there is not substantial evidence to support this causation element, and we must therefore reverse the trial court's judgment on all claims.

Again, we review the trial court's denial of a motion for directed verdict, denial of motion for judgment notwithstanding the verdict, and denial of new-trial motion for whether there is substantial evidence to support the jury's verdict. *State Auto Prop. & Cas. Ins. Co. v. Swaim*, 338 Ark. 49, 991 S.W.2d 555 (1999); *Mercantile Bank v. B & H Assoc., Inc.*, 330 Ark. 315, 954 S.W.2d 226 (1997).

First, causation is a question of fact for the jury to decide. *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002). The jury was free to believe Mr. Roleson's testimony regarding his negotiations with Campbell and discount Mr. Campbell's statements. In fact, our review requires us to review the evidence and all reasonable inferences therefrom in the light most favorable to Roleson. *Swaim, supra.* Roleson offered several letters between it and Campbell regarding the purchase, clearly indicating that the parties were in negotiations prior to Roleson and Mr. O'Conner's meeting with Mr. Young in February. Indeed, it appears from the evidence that Mr. Campbell and Mr. Roleson continued negotiating after February. In fact, Mr. Campbell admitted that he "could have" had a telephone conversation in August with Mr. Roleson in which they agreed to a deal. The jury was free to infer that, absent Miller's involvement, this "deal" would have been set forth in a formal contract and closed. Mr. Bratcher testified that he did not know where Mr. O'Conner got the idea to buy Campbell's business, but that he advised Mr. O'Conner that it was a bad deal. Mr. O'Conner's decision to buy Campbell and his subsequent meeting with Mr. Campbell occurred within days of Mr. O'Conner's meeting with Mr. Young. Both Mr. Roleson and Mr. Holcomb testified that they were told at a national sales meeting in April that Miller's executives did not want Campbell to go to Roleson but to White River. The jury was free to believe the testimony and inferences therefrom that Miller instructed Mr. O'Conner to purchase Campbell and that, absent Miller's interference, Roleson and Campbell would have entered into a deal for the sale of Campbell's business to Roleson. Based upon the evidence presented, we hold that there is substantial evidence to support the jury's finding.

### IV. Statute of Limitations

Miller argues that the trial court erred in submitting the Franchise Act claim because some of the evidence to support the claim was barred by the statute of limitations. This evidence concerned Miller's alleged interference with the potential pur-

chase by Roleson in 1999 of a Mountain Home distributor's business. The trial court held that the five-year statute of limitations, set forth in Ark. Code Ann. § 16-56-115 (1987), applied. Miller argues that the three-year statute of limitations found in Ark. Code Ann. § 16-56-105 (1987) should have applied. Roleson does not argue that the claim would not have been barred under a three-year limitations period, but that the trial court correctly applied the five-year limitations period. We review the trial court's interpretation of statutes *de novo*. *Willis v. King*, 352 Ark. 55, 98 S.W.3d 427 (2003).

While Ark. Code Ann. § 4-72-207 (Repl. 2001) contains a five-year statute of limitations for criminal prosecutions under the Arkansas Franchise Practices Act, the Act does not contain its own statute of limitations for civil actions. For this reason, the circuit court applied the five-year, catch-all statute of limitations set forth in Ark. Code Ann. § 16-56-115 (1987). This statute applies to any Act or cause of action which does not specify its own limitation period and does not fit within one of the following specific statutory limitations periods: one year, Ark. Code Ann. § 16-56-104; three year, Ark. Code Ann. § 16-56-105; statutory penalties, Ark. Code Ann. § 16-56-108; or actions against sheriffs, coroners, and other officials, Ark. Code Ann. § 16-56-109. *See also Jackson v. Swift-Eckrich*, 830 F. Supp. 486 (W.D. Ark. 1993).

Miller relies on our decision in *Chalmers v. Toyota Motor Sales, USA, Inc.*, 326 Ark. 895, 935 S.W.2d 258 (1996), to support its argument that the three-year statute of limitations applies to civil claims under the Franchise Act. Miller's reliance is misplaced. The appeal in that case involved a fraud claim and whether the claim was tolled by fraudulent concealment and the continuing tort doctrine. *Chalmers* does not govern the issue before us.

In order to fit within the three-year statute of limitations found in Ark. Code Ann. § 16-56-105, the Franchise Act claim must be (1) "an action founded upon any contract, obligation, or liability not under seal and not in writing," section 105(1), or (2) "an action founded on any contract or liability, expressed or implied[,]" section 105(3). However, the franchise agreement is in writing and would arguably fit more appropriately within Ark. Code Ann. § 16-56-111(a) (Supp. 2005), a five-year statute of limitations period for "[a]ctions to enforce written obligations, duties, or rights." *See also Chalmers, supra* (holding that the statute of limitations for breach of a written contract is five years).

■ We hold that neither Ark. Code Ann. § 16-56-105 nor Ark. Code Ann. § 16-56-111(a) applies in this case. The circuit court was correct: the catch-all, five-year statute of limitations applies to claims under the Franchise Act because none of the other statutes specifically applied. To hold otherwise would negate the very purpose of Ark. Code Ann. § 16-56-115. *See, e.g., Jackson v. Swift-Eckrich*, 830 F. Supp. 486 (W.D. Ark. 1993) (holding that the five-year, catch-all statute applied to a claim under the Arkansas Unfair Practices Act because the Act contained no statute of limitations).

## *V. Expert Testimony*

Finally, Miller argues that the trial court abused its discretion in admitting the testimony of Roleson's two experts on damages because the experts repeatedly changed their opinions and methodology, making the opinions unreliable. This court has long recognized that the admissibility of expert testimony rests largely within the trial court's broad discretion, and we will not reverse the trial court's determination absent an abuse of that discretion. *Mercantile Bank v. B & H Associated, Inc.*, 330 Ark. 315, 323, 954 S.W.2d 226, 231 (1997); *See also Coca-Cola Bottling Company v. Gill*, 352 Ark. 240, 261, 100 S.W.3d 715, 728 (2003).

> Generally, the tendency is to permit the jury to hear the testimony of the person having superior knowledge in a given field unless clearly lacking in either training or experience, and too rigid a standard should be avoided. *Mine Creek Contractors, Inc. v. Grandstaff*, 300 Ark. 516, 780 S.W.2d 543 (1989). If some reasonable basis from which it can be said the witness has knowledge of the subject beyond that of persons of ordinary knowledge, his evidence is admissible.

*Mercantile Bank, supra.* Expert opinion testimony is admissible "if . . . specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Ark. R. Evid. 702.

Miller argues that the trial court did not act as a "gatekeeper" as required by the Supreme Court's holding in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and our decision in *Farm Bureau Mut. Ins. Co. of Ark. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000). Under those cases, the circuit court must make a preliminary assessment of whether the reasoning or methodology underlying expert testimony is valid and whether the reasoning

and methodology used by the expert has been properly applied to the facts in the case. *Coca-Cola Bottling Company*, 352 Ark. at 262, 100 S.W.3d at 729. Miller's primary concern is that Roleson's experts did not calculate lost profits with an assumption of sufficient risk. Miller also disagreed with the methodology used to calculate the projected future profits.

Miller's arguments go to the weight of the expert's testimony and not to its admissibility. Miller elected not to call its own expert witness on damages to present contrary evidence using a different methodology including more potential risk. Miller was free to and did cross-examine both experts regarding their methods and risk assessment. We hold that both experts' knowledge and experience were sufficient to assist the jury in understanding the evidence and in determining the fact issues under Rule 702. The circuit court did not abuse its discretion in allowing Roleson's experts to testify regarding damages.

For the reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

GLAZE, J., concurs in part, dissents in part.

TOM GLAZE, Justice, concurring in part; dissenting in part. The majority opinion affirms the trial court based on Miller's violation of the "good faith" provision contained in the Franchise Act. In doing so, the majority affirms the trial court's award of damages for $1.6 million. It can be assumed that this amount represents Roleson's lost profits that he would have earned had he successfully purchased Campbell's entire business, including his Coors distributorship.[1]

The Franchise Act defines "franchise" as follows:

[A] written or oral agreement for a definite or indefinite period, in which a person grants to another a license to use a trade name, trademark, service mark, or related characteristic within an exclusive or nonexclusive territory, at wholesale, retail, by lease agreement , or otherwise.

Ark. Code Ann. § 4-72-202(1) (Repl. 2001). According to the statute, the definition of franchise is expressly limited to the terms of

---

[1] Campbell's business was approximately 96% Coors and 4% acquired brands.

the "written or oral agreement." Ark. Code Ann. § 4-72-202(1) (Repl. 2001). In other words, the Franchise Act only governs what is contained within the franchise agreement. It is undisputed that Roleson did not have a right to acquire Campbell's Coors brands under the franchise agreement. Consequently, Roleson cannot collect full damages based on a violation of the Franchise Act alone.

In conclusion, it is my view that Roleson is limited to lost profits from the acquired brands, and is not entitled to damages stemming from Coors brands.[2] If Roleson is entitled to the $1.6 million in damages, it must be based on either the tortious interference or civil conspiracy cause of action.

---

[2] The opinion is incorrect when it states that, "The parties have agreed that if we affirm on any one of the jury's three verdicts, the court's judgment must be affirmed."